# United States Court of Appeals
## for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**
August 7, 2020

Lyle W. Cayce
Clerk

No. 18-51092

Green Valley Special Utility District,

*Plaintiff—Appellee Cross—Appellant*,

*versus*

City of Schertz, Texas; DeAnn T. Walker,
in her official capacity as Chairman and Commissioner
of the PUC; Arthur C. D'Andrea, in his official
capacity as a Commissioner of the PUC;
John Paul Urban, in his official capacity As Executive
Director of the Public Utility Commission of Texas;
Brian James, in his official capacity as the City
Manager of the City of Schertz, TX; Shelly Botkin,

*Defendants—Appellants Cross—Appellees*.

Appeal from the United States District Court
for the Western District of Texas
USDC No. 1:17-CV-819

Before Owen, *Chief Judge*, and Jones, Smith, Stewart, Dennis,
Elrod, Southwick, Haynes, Graves, Higginson, Costa,
Willett, Ho, Duncan, Engelhardt, and Oldham,
*Circuit Judges*.[*]

---

[*] Judge Cory T. Wilson joined the court on July 3, 2020, and did not participate in the consideration of this matter, which was submitted May 20, 2020.

No. 18-51092

Jerry E. Smith, *Circuit Judge*, joined by Jones, Stewart, Dennis, Elrod, Southwick, Haynes, Graves, Higginson, Costa, Willett, Ho, Duncan, Engelhardt, and Oldham, *Circuit Judges*:

This appeal arose out of two orders of the Texas Public Utility Commission ("PUC") decertifying territory from the certificate of convenience and necessity ("CCN") issued to Green Valley Special Utility District ("Green Valley") for sewer (wastewater) service. Green Valley sued, averring that, because it had "provided or made available" sewer service, 7 U.S.C. § 1926(b) protected that service from encroachment.

We granted en banc hearing to consider the meaning of "provided or made available" in § 1926(b). We hold that a utility has "provided or made available" service if it (1) has adequate facilities to provide service to the relevant area within a reasonable time after a request for service is made and (2) has the legal right to provide service. The panel opinion in *North Alamo Water Supply Corp. v. City of San Juan*, 90 F.3d 910 (5th Cir. 1996) (per curiam), is overruled. As for the district court's judgment, we affirm in part, vacate in part, and remand.

I.

Green Valley is a special utility district[1] that provides water and sewer service in an area that includes parts of Bexar, Comal, and Guadalupe

---

[1] As a special utility district, Green Valley is a political subdivision of Texas. *See* Tex. Water Code § 65.011 ("A special utility district may be created under and subject to the authority, conditions, and restrictions of, and is considered a conservation and reclamation district under Article XVI, Section 59, of the Texas Constitution."); *Bennett v. Brown Cty. Water Imp. Dist. No. 1*, 272 S.W.2d 498, 501 (Tex. 1954) ("The people of Texas, in adopting . . . Article XVI, Section 59, have very plainly set forth that they decree these districts to be governmental agencies and bodies politic." (quotation marks omitted)).

No. 18-51092

Counties. Green Valley's mostly rural service territory is east of San Antonio, near the Cities of Schertz and Cibolo. Green Valley provides service under two CCNs issued and regulated by the PUC. Under Texas law, CCNs "give holders the exclusive right to provide water or sewer service within particular service areas."[2] "In 2003, Green Valley obtained a $584,000 loan from the [U.S. Department of Agriculture "(USDA")] to fund its water service. That loan, which remains outstanding, is secured by Green Valley's water utility revenues."[3]

In April 2016, Guadalupe Valley Development Corporation ("GVDC") petitioned the PUC to decertify its approximately 160-acre parcel from Green Valley's sewer CCN. Shortly thereafter, the City of Schertz and its City Manager (jointly "Schertz"), after notifying Green Valley of its intent to provide sewer service, petitioned the PUC to decertify a separate 405-acre tract that fell within its corporate limits.

The PUC recognized that Green Valley "intend[ed] to build a regional wastewater-treatment plant" and had "an agreement to deliver waste to the city of Marion's wastewater-treatment plant." Nevertheless, the PUC found that Green Valley hadn't "committed facilities or lines providing sewer service" or "performed acts or supplied anything" to the property. The PUC also determined that, as a matter of both law and fact, the tract wasn't "receiving sewer service from Green Valley." Based on that conclu-

---

[2] *Green Valley Special Util. Dist. v. City of Cibolo ("Cibolo")*, 866 F.3d 339, 340 (5th Cir. 2017) (citing Tex. Water Code § 13.242(a)); *see also Tex. Gen. Land Office v. Crystal Clear Water Supply Corp.*, 449 S.W.3d 130, 133 (Tex. App.—Austin 2014, pet. denied).

[3] *Cibolo*, 866 F.3d at 340. Green Valley later closed on a second, $5.1 million USDA loan to fund water system improvements. The USDA has also approved another $3.1 million for Green Valley's sewer service, but that loan has not yet closed and is the subject of ongoing litigation. *See City of Schertz v. USDA*, No. 19-51056 (5th Cir. May 1, 2020) (placed in abeyance pending issuance of this mandate).

sion, the PUC ruled that, under Texas Water Code ("TWC") § 13.254(a-5),[4] GVDC was entitled to have its petition approved. Finally, the PUC noted that, under TWC § 13.254(a-6),[5] it could not deny GVDC's "petition based on the fact that Green Valley . . . [wa]s a borrower under a federal loan program." The PUC granted the petition, removing GVDC's 160-acre property from Green Valley's sewer CCN.

Schertz's petition was similarly successful. The PUC found that Green Valley "provide[d] no retail sewer service," had no contractual obligations to do so, and had not received any requests for such service in the tract that Schertz sought to decertify. Moreover, Green Valley "ha[d] made no physical improvements" to the tract, "ha[d] no existing retail sewer infrastructure anywhere within the boundaries of its CCN," and "[wa]s not currently capable of providing sewer service to anyone in the decertificated area." The PUC thus granted Schertz's petition and amended Green Valley's CCN to remove the decertified tract, concluding that TWC § 13.255(c) required it do so. The PUC also determined that Green Valley was not entitled to any compensation for future lost profits, because "[n]o property of Green Valley will be rendered useless or valueless . . . by the decertification."

Green Valley sought relief related to those two orders—the GVDC Order and the Schertz Order, respectively—by (1) seeking judicial review in

---

[4] TWC § 13.254(a-5) has since been re-designated as § 13.2541(b). *See* Act of May 25, 2019, 86th Leg. R.S., ch. 688, § 4, 2019 Tex. Sess. Law Serv. ch. 688 (West) (codified at TWC §§ 13.254, 13.2541).

[5] TWC § 13.254(a-6) has since been re-designated as § 13.2541(c)–(d), (f). *See id.* The Texas Legislature also added a new requirement—§ 13.2541(e)—that "[t]he certificate holder may not initiate an application to borrow money under a federal loan program after the date the petition is filed until the utility commission issues a decision on the petition." *Id.*

No. 18-51092

state court[6] and (2) suing GVDC, Schertz, and several PUC commissioners in their official capacities (collectively, "PUC Officials") in this action under 42 U.S.C. § 1983.  Green Valley averred that its 2003 USDA loan protected its service territory from encroachment.  The key federal statute, 7 U.S.C. § 1926(b), confers that protection:

> The service provided or made available through any such association shall not be curtailed or limited by inclusion of the area served by such association within the boundaries of any municipal corporation or other public body, or by the granting of any private franchise for similar service within such area during the term of such loan . . . .

Green Valley also asserted that § 1926(b) preempted TWC §§ 13.254(a-1) and 13.2541(d).[7]  Green Valley sought, *inter alia*, declaratory and injunctive relief to prevent (1) the PUC from enforcing §§ 13.254(a-1) and 13.2541(d), (2) the PUC from decertifying any portion of its service territory, and (3) any other utility from making service available within its service territory.

Shortly after Green Valley filed its first amended complaint, the PUC Officials moved to dismiss.[8]  They asserted Eleventh Amendment immunity, averring that *Ex parte Young*, 209 U.S. 123 (1908), did not apply or, alternatively, that it did not entitle Green Valley to an injunction.  The PUC Officials also averred that Green Valley had failed to state a claim; Schertz and GVDC

---

[6] The Travis County District Court has since abated those proceedings in favor of this litigation.

[7] Importantly, Green Valley did not seek a declaration that either § 13.2541(b) or § 13.255 was preempted.

[8] Green Valley filed a second amended complaint while the motion to dismiss was pending.

filed similar motions.  The district court denied them all.

Six months later,[9] every party moved for summary judgment.  The district court denied GVDC's and Schertz's motions but granted Green Valley's and the PUC Officials' motions in part.  Relying on *North Alamo*, the court granted summary judgment to Green Valley on its § 1926(b) claims, finding that the PUC had not determined that Green Valley had failed to fulfill its state-law duty to provide service to the Schertz and GVDC tracts.  Conversely, the court granted summary judgment to the PUC Officials on the preemption claims, holding (1) that Green Valley lacked standing to challenge TWC § 13.254(a-1) and (2) that § 13.2541(d) was not preempted "because it neither directly conflict[ed] with § 1926(b) nor pose[d] an obstacle to the goals and purpose of Congress in enacting § 1926(b)."

GVDC, Schertz, and the PUC Officials appealed as to the § 1926(b) claims, and Green Valley cross-appealed as to both the § 1926(b) and preemption claims.  Shortly thereafter, GVDC settled with Green Valley and dismissed its appeal.  We granted Schertz's and the PUC Officials' petitions for hearing en banc.

## II.

"This court has a continuing obligation to assure itself of its own jurisdiction, sua sponte if necessary."  *United States v. Pedroza-Rocha*, 933 F.3d 490, 493 (5th Cir. 2019) (per curiam), *cert. denied*, 2020 U.S. LEXIS 2749, 206 L. Ed. 2d 940 (2020).  Before considering the merits, we address three jurisdictional issues: (1) whether Green Valley has standing to press its preemption claims as to TWC § 13.254(a-1); (2) whether the Green Valley's settlement with GVDC mooted any of its claims; and (3) whether state

---

[9] Green Valley filed its third amended complaint in the meantime.

sovereign immunity bars Green Valley's suit against the PUC Officials.

## A.

To have standing, Green Valley "must demonstrate (1) that [it] suffered an injury in fact that is concrete, particularized, and actual or imminent, (2) that the injury was caused by the defendant[s], and (3) that the injury would likely be redressed by the requested judicial relief." *Thole v. U.S. Bank N.A.*, 140 S. Ct. 1615, 1618 (2020).

Green Valley maintains that it has standing to challenge § 13.254(a-1) as preempted. Its theory is as follows: First, when "decertifying the Schertz Property, the PUC [Officials] incorporated by reference their prior legal analysis on [the City of] Cibolo's application for decertification." Second, in that order, "the PUC [Officials] expressly relied on section 13.254(a-1) to decline to enforce § 1926(b)." And third, that necessarily means that the PUC Officials relied on § 13.254(a-1) when decertifying the Schertz tract.

Green Valley misunderstands the Cibolo Order. There, the PUC determined that it lacked the authority to address whether § 1926(b) preempted § 13.255, because no "provision within the [TWC] permit[ed] [it] to abdicate its statutory duties regarding service-area certification based upon preemption concerns." For support, the PUC alluded to § 13.254(a-1) *as an example* of a separate provision that prohibited it "from denying applications to revoke all or part of a CCN . . . on the basis that a certificate holder is a borrower of a federal loan program." The PUC did not find that § 13.254(a-1) applied to § 13.255 petitions, and the TWC makes clear that those sections apply to distinctly different situations.

On its face, the Schertz Order relied only on § 13.255 to decertify the Schertz tract. It made no reference to § 13.254(a-1), which makes sense, given that that provision applies only to *property-owner* decertification, not single-service municipal decertification. Any injury Green Valley suffered

related to the Schertz Order is not traceable to § 13.254(a-1), so holding that § 1926(b) preempts § 13.254(a-1) would provide Green Valley with no redress.

Based on that, the district court correctly opined that Green Valley lacked standing to challenge § 13.254(a-1). The court erred, however, by dismissing, with prejudice, Green Valley's claim that § 1926(b) preempted § 13.254(a-1). "Ordinarily, when a complaint is dismissed for lack of jurisdiction, including lack of standing, it should be without prejudice."[10] Therefore, we modify the judgment dismissing Green Valley's preemption claim as to § 13.254(a-1) to make it without prejudice, and we affirm that portion of the judgment as so modified.

## B.

Next, we consider mootness. "A case becomes moot . . . when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013) (some quotation marks omitted). That happens "when it is impossible for a court to grant any effectual relief whatever to the prevailing party." *Knox v. Serv. Emps. Int'l Union, Local 1000*, 567 U.S. 298, 307 (2012) (quotation marks and alteration omitted). Generally speaking, a settlement can moot a dispute.[11]

---

[10] *Williams v. Morris*, 614 F. App'x 773, 774 (5th Cir. 2015) (per curiam); *see also In re Great Lakes Dredge & Dock Co.*, 624 F.3d 201, 209 (5th Cir. 2010) ("[I]f the district court had held that it lacked subject matter jurisdiction, it should have entered dismissal without prejudice . . . .").

[11] *See, e.g.*, *Commonwealth Oil Ref. Co. v. EPA (In re Commonwealth Oil Ref. Co.)*, 805 F.2d 1175, 1181 (5th Cir. 1986) ("If a dispute has been settled or resolved, . . . it is considered moot." (quoting *Lamonica v. S.L.E., Inc. (In re S.L.E., Inc.)*, 674 F.2d 359, 364 (5th Cir. 1982)).

No. 18-51092

Green Valley's settlement with GVDC deprives us of jurisdiction over Green Valley's claims related to the GVDC Order. The settlement agreement provides for the following: (1) GVDC and Green Valley have committed to Green Valley's providing "high-capacity, industrial-level" water and sewer service to the GVDC tract; (2) the parties ceased litigation in favor of mutual cooperation on all matters, including obtaining recertification of the GVDC tract; (3) GVDC dismissed its appeal; and (4) Green Valley waived its claims for attorney's fees and costs. Green Valley described that compromise as "the very agreement [it] insisted all along it was 'willing and able' to enter into . . . ." In other words, Green Valley and GVDC have completely settled their differences, and there is no relief left for us to award.

Green Valley suggests that the fact that its petition for recertification remains pending—that is, has not yet been approved—means this case is not moot. We disagree. Green Valley filed that petition at GVDC's request, and no one—including Cibolo, which would have been the competing utility before settlement—contested it. Green Valley has approval from the Texas Commission on Environmental Quality to construct a regional wastewater treatment facility that will serve the GVDC tract, and Green Valley has started construction on other infrastructure to serve the property. Moreover, the PUC's staff has recommended that the recertification petition be approved. Based on those unique facts, the PUC's approving the settlement and recertifying the GVDC tract is routine,[12] and, indeed, appears to be held

---

[12] The PUC regularly approves and incorporates agreements for serving customers into utilities' CCNs. *See* TWC § 13.248. Moreover, because Green Valley's application is unopposed, there is *no other utility* competing to provide the service that the GVDC tract needs. *Cf. id*. § 13.246(c) (noting that relevant factors for the PUC to consider include, among other things, "the adequacy of service currently provided to the requested area," "the need for additional service," and "the feasibility of obtaining service from an adjacent retail public utility").

up only by this litigation.[13]  The mere fact that the PUC has not approved it yet isn't enough to maintain a "live" controversy in federal court.

Green Valley maintains that, notwithstanding its settlement, its preemption claim as to TWC § 13.2541(d) survives.  That is so, Green Valley posits, because "those claims are directed at the PUC Officials' prospective compliance with § 1926(b) in any other § 13.2541 proceedings, beyond just the GVDC tract."  But Green Valley does not challenge any other § 13.2541(d) decertification order *in this litigation*, nor does it point to any ongoing § 13.2541(d) proceeding in which it is involved.[14]  Any hypothetical future decertifications are not before us.  Speculation that the PUC *could* apply § 13.2541(d) against Green Valley sometime *in the future* is not enough to prevent this case from being moot *today*.[15]

With Green Valley's settlement's having mooted any controversy as to its claims related to the GVDC Order, we next consider remedy.  When a case becomes moot on appeal, the standard practice "is to reverse or vacate the judgment below and remand with a direction to dismiss."  *United States*

---

[13] Though it does not affect our conclusion, we take judicial notice that on July 16, 2020, the PUC remanded Green Valley's recertification petition to Docket Management to determine whether the petition should be dismissed without prejudice.  The PUC did so for three reasons, none of which relates to the merits of Green Valley's petition.  First, the PUC observed that "the district court explicitly invalidated [its] order" decertifying the GVDC tract.  Second, because this en banc court has not yet ruled on the PUC Officials' appeal, "the district court's decision currently stands."  And third, on account of that, the PUC could not order recertification because, in effect, the district court's order meant that the decertification never occurred in the first place.  Our decision removes all those obstacles.

[14] The controversy as to the Schertz Order cannot save this claim, because, like TWC § 13.254(a-1), § 13.2541 applies only to property-owner decertification.

[15] Green Valley's claims related to the GVDC Order are moot, so we need not consider whether Green Valley has standing to press its claim that § 1926(b) preempts TWC § 13.2541(d).

*v. Munsingwear, Inc.*, 340 U.S. 36, 39 (1950). Though "mootness by reason of settlement," at least generally, "does not justify vacatur of a judgment under review," *U.S. Bancorp Mortg. Co. v. Bonner Mall P'ship*, 513 U.S. 18, 29 (1994), we still must examine "the equities of the individual case," *Staley v. Harris Cty.*, 485 F.3d 305, 312 (5th Cir. 2007) (en banc).

We decide in favor of vacatur, which the equities favor for three reasons. First, only part of this case is moot—there is still a live controversy as to the Schertz Order—which counsels in favor of vacating the portion that is no longer "live." Second, though *U.S. Bancorp*, 513 U.S. at 26–28, suggests that the value of precedent might counsel against vacatur, that is not implicated (at least as acutely) where a district court's decision—whose precedential value is limited only to its persuasiveness—would be taken off the books.[16] And third, none of the criteria that counseled against vacatur in *Staley* is present here.[17]

## C.

The first two jurisdictional hurdles tripped up most of Green Valley's

---

[16] *See Russman v. Bd. of Educ. of Enlarged City Sch. Dist. of City of Watervliet*, 260 F.3d 114, 121 n.2 (2d Cir. 2001); *see also Staley*, 485 F.3d at 318 (DeMoss, J., dissenting).

[17] The case was mooted through the joint actions of Green Valley and GVDC, not the *unilateral* action of the losing party. *See Staley*, 485 F.3d at 312; *Ministry of Oil of the Republic of Iraq v. Kurdistan Region of Iraq*, 634 F. App'x 953, 959–60 (5th Cir. 2015) (per curiam) (observing that losing party's actions to moot the case undermined its later argument for vacatur). Moreover, the settlement agreement is not "temporary," which differs materially from removing a monument from public view so that a courthouse could be renovated, as in *Staley*, 485 F.3d at 312. Finally, the relief that the district court ordered affects parties beyond those involved in this litigation—the judgment prevents the PUC from recertifying it *to anyone* for as long as Green Valley's loan remains outstanding. *See id.* at 312–13; *Hous. Chronicle Pub. Co. v. City of League City*, 488 F.3d 613, 620 (5th Cir. 2007) (noting that the fact that the challenged law was applied only against the plaintiffs counseled against vacating the injunction).

claims, and only its § 1926(b) claim related to the Schertz Order remains. With that in mind, we turn to the last jurisdictional bar: sovereign immunity.[18]

1.

"In most cases, Eleventh Amendment sovereign immunity bars private suits against nonconsenting states in federal court." *City of Austin v. Paxton*, 943 F.3d 993, 997 (5th Cir. 2019). That immunity "also prohibits suits against state officials or agencies that are effectively suits against a state." *Id.*

There are two primary exceptions. First, Congress may expressly abrogate state sovereign immunity. *See, e.g., AT&T Commc'ns v. BellSouth Telecomms. Inc.*, 238 F.3d 636, 643 (5th Cir. 2001). And second, the *Ex parte Young* exception "permits suits for prospective . . . relief against state officials acting in violation of federal law." *Frew ex rel. Frew v. Hawkins*, 540 U.S. 431, 437 (2004). Here, Congress has not abrogated Texas's sovereign immunity, and the State has not consented to suit. *Young* is the whole ballgame.

For *Young* to apply, three criteria must be satisfied: (1) A "plaintiff must name individual state officials as defendants in their official capacities," *Raj v. La. State Univ.*, 714 F.3d 322, 328 (5th Cir. 2013); (2) the plaintiff must "allege[ ] an ongoing violation of federal law," *Verizon Md. Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002); and (3) the relief sought must be "properly characterized as prospective," *id.* To determine whether the exception applies, we conduct a simple, "straightforward inquiry," *Air Evac*

---

[18] *See Union Pac. R.R. v. La. Pub. Serv. Comm'n*, 662 F.3d 336, 340 (5th Cir. 2011) (per curiam) ("Eleventh Amendment immunity operates like a jurisdictional bar, depriving federal courts of the power to adjudicate suits against a state.").

No. 18-51092

*EMS, Inc. v. Tex., Dep't of Ins.*, 851 F.3d 507, 517 (5th Cir. 2017), and we do not consider the merits of the underlying claims, *see Austin*, 943 F.3d at 998.

But what qualifies as prospective? Merely requesting injunctive or declaratory relief is not enough; sovereign immunity does not turn entirely on the relief sought.[19] Often, the line between the permissible and the forbidden is fuzzy.[20] "In discerning on which side of th[at] line a particular case falls, we look to the substance rather than to the form of the relief sought and will be guided by the policies underlying . . . *Young*." *Papasan v. Allain*, 478 U.S. 265, 279 (1986) (citation omitted). "Remedies designed to end a continuing violation of federal law are necessary to vindicate the federal interest in assuring the supremacy of that law[,] . . . [b]ut compensatory or deterrence interests are insufficient to overcome the dictates of the Eleventh Amendment." *Green v. Mansour*, 474 U.S. 64, 68 (1985).

"It is true," of course, "that a complaint must allege that the defendant *is violating* federal law, not simply that the defendant *has done so*." *NiGen Biotech, L.L.C. v. Paxton*, 804 F.3d 389, 394 (5th Cir. 2015) (second emphasis added). But "[a]s long as the claim seeks prospective relief for ongoing harm, the fact that a current violation can be traced to a past action does not bar relief under . . . *Young*." *Williams ex rel. J.E. v. Reeves*, 954 F.3d 729, 738 (5th Cir. 2020).

2.

The district court found *Young* satisfied, because "it is nearly axio-

---

[19] *See Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 58 (1996) ("[T]he relief sought by a plaintiff suing a State is irrelevant to the question whether the suit is barred by the Eleventh Amendment.").

[20] *See, e.g.*, *Edelman v. Jordan*, 415 U.S. 651, 667 (1974) ("[T]he difference between the type of relief barred by the Eleventh Amendment and that permitted under . . . *Young* will not in many instances be that between day and night.").

matic that an injunction prohibiting state administrative officials from enforcing preempted state regulations qualifies as prospective relief under . . . *Young.*" Based on the above, we do not have jurisdiction to consider Green Valley's preemption claims.

Green Valley's requests for injunctive relief against the PUC Officials present a close question. Specifically, Green Valley requested injunctions

- prohibiting [the PUC Officials] from decertifying [Green Valley's] certificated water or wastewater service area pursuant to [TWC] section 13.254(a-5) or section 13.255(b)–(c), as long as [Green Valley's] federal loan remains outstanding; . . . [and]

- prohibiting [the PUC Officials] from permitting or authorizing any entity other than . . . Green Valley . . . to provide or make available water or wastewater service to any area that was decertified from [Green Valley's] certificated water or wastewater service area pursuant to section 13.254(a-5) or 13.255(b)–(c) on or after December 31, 2003, as long as [Green Valley's] federal loan remains outstanding . . . .

On its face, that prayer satisfies *Young*: It requests relief prospectively requiring the PUC Officials to refrain from taking future actions to enforce an unlawful order.[21]

---

[21] Green Valley also requests an injunction "requiring [the PUC Officials] to recertify into [Green Valley's] CCN No. 20973 the property decertified therefrom by November 17, 2017 order in PUC Docket No. 45956." The PUC Officials suggest that it is impermissible for us to order them to take affirmative action. For support, they rely on the following discussion: "[A] suit may fail, as one against the sovereign, . . . if the relief requested cannot be granted by merely ordering the cessation of the conduct complained of but will require affirmative action by the sovereign or the disposition of unquestionably sovereign property. *Larson v. Domestic & Foreign Commerce Corp.*, 337 U.S. 682, 691 n.11 (1949). Whether that *dictum* bars all positive injunctions under *Young* is an unsettled question that has roused significant debate. *See, e.g., Vann v. Kempthorne*, 534 F.3d 741, 751–53 (D.C. Cir. 2008) (surveying the treatment of *Larson*'s footnote 11 and concluding that *Larson* may not bar all positive injunctive relief).

No. 18-51092

The PUC Officials vehemently disagree. In their view, there is no ongoing violation of which to speak: Green Valley's CCN *has already been altered*, and that decertification was a discrete event. Any prospective harm that the decertification causes merely identifies collateral effects of a past act, not a continuing violation of federal law. Accordingly, the PUC Officials maintain, the remedies Green Valley wants are inherently retrospective, because they are targeted at undoing the decertification.

Though the ongoing harms that Green Valley alleges it suffers can be traced to the PUC's order decertifying the Schertz territory, that does not mean *Young* bars this suit. *See Williams*, 954 F.3d at 738–39. Green Valley's pleadings ask us to prohibit the PUC Officials from taking two actions going forward: (1) decertifying Green Valley's service territory and (2) allowing another utility to serve any area decertified from Green Valley's territory. That relief, if awarded, would redress an ongoing violation of Green Valley's rights under § 1926(b)—curtailment of territory where Green Valley maintains it provided service or made it available—without requiring any money to be taken from the state's coffers. That is enough to satisfy the "straightforward inquiry" the Supreme Court has commanded us to employ, regardless of whether Green Valley is right on the merits. *See, e.g.*, *Va. Office for Prot. & Advocacy v. Stewart*, 563 U.S. 247, 255 (2011).

The decision in *Verizon Maryland* is instructive. Verizon sought injunctive and declaratory relief from a state agency's order requiring it to pay compensation to another telecommunications carrier for exchanging certain

---

At this stage, however, we need not determine whether Green Valley's request for recertification is impermissible under *Larson*'s footnote 11. To proceed under *Young*, Green Valley needs only one form of available prospective relief, and its two other requests for injunctive relief pass muster. Accordingly, we leave for another day the question whether recertification is impermissible under *Larson*.

calls. *See Verizon Md.*, 535 U.S. at 640.  The court found that Verizon's requests for injunctive relief, which would prevent the state agency from enforcing its order that ran counter to federal law, "clearly satisfie[d] our straightforward inquiry" under *Young*. *Id.* at 645 (quotation marks omitted).

The same applies here.[22]  Green Valley's complaint asks the district court to declare unlawful the defendants' "*continuing conduct*" and to prohibit both "the PUC Officials' grant of relief . . . [and Schertz's] pursuit of relief" arising from the PUC's orders.  We thus construe the complaint as a request to restrain state officials from enforcing an unlawful order.  Just as in *Verizon Maryland*.

But just because some of the relief Green Valley seeks is proper under *Young* does not mean that all of it is.   The district court *invalidated* both the Schertz Order and the PUC's order recertifying the tract to the city.  That relief—"the voiding of a final state" agency order—is "quintessentially retrospective" and thus out of bounds under *Young*. *Republic of Paraguay v.*

---

[22] *Cantu Services, Inc. v. Roberie*, 535 F. App'x 342 (5th Cir. 2013), on which the PUC Officials rely, is distinct.  There, the plaintiff brought due-process claims against several Louisiana state officials when the state refused, after a bidding process, to renew Cantu's food-service contract. *Id.* at 343.  The panel held that the violation was not "ongoing," because "[t]he award process terminated with the issuance of a new contract." *Id.* at 345.  But unlike in *Cantu*, Green Valley has an ongoing legal right:  Section 1926(b) protects, *for the life of its loan*, the area in which it has provided service or made it available.

The decision in *Opala v. Watt*, 454 F.3d 1154 (10th Cir. 2006), also provides no help.  Justice Opala, the former Vice-Chief Justice of the Oklahoma Supreme Court, sued after his colleagues "changed the rule of rotation for elevation of a Chief Justice." *Id.* at 1156.  That change had the effect both of permitting the incumbent Chief Justice's re-election and of barring Justice Opala from becoming Chief. *See id.* at 1156–57.  The Tenth Circuit held that it was unable to reinstate the pre-amendment rule of rotation—*i.e.*, "make Justice Opala Vice–Chief Justice again"—because that remedy was "precisely the type of retroactive equitable relief prohibited under the . . . *Young* doctrine." *Id.* at 1160.  But critically, and unlike the situation in *Opala*, Green Valley is not asking that we reinstate the pre-decertification *status quo*.  Instead, it merely asks to be the serving utility *going forward*.

*Allen*, 134 F.3d 622, 628 (4th Cir. 1998). But even if some of the relief sought is not available, it does not follow that *Young* bars Green Valley's entire suit. Because at least one form of prospective relief is possibly available to Green Valley, its claims against the PUC Officials are not barred by the Eleventh Amendment.

III.

With the jurisdictional questions resolved, we address one final antecedent issue that the PUC Officials (but not Schertz) raise: whether, under *City of Safety Harbor v. Birchfield*, 529 F.2d 1251 (5th Cir. 1976), Green Valley is a proper § 1983 plaintiff.

"It is the general rule . . . that a federal appellate court does not consider an issue not passed upon below." *Singleton v. Wulff*, 428 U.S. 106, 120 (1976). But it is within our discretion to determine whether to consider an issue presented for the first time on appeal. *See Glass v. Paxton*, 900 F.3d 233, 242–43 (5th Cir. 2018). Doing so might be appropriate for "purely legal questions" where (1) "the proper resolution is beyond any doubt" or (2) "injustice might otherwise result." *Id.* at 243.

Immediately, it is important to draw a distinction between Schertz and the PUC Officials. Schertz *never* relied on *Birchfield*, even after (1) the PUC Officials invoked it in their initial brief on appeal and (2) Green Valley countered by saying the issue was forfeited. Just because we have discretion to address a forfeited argument that is *later asserted* doesn't mean that we can (or should) make a party's argument for it in the first place.[23] By failing to bring *Birchfield* up even once on appeal, Schertz has forfeited any contention

---

[23] "In our adversarial system of adjudication, we follow the principle of party presentation." *United States v. Sineneng-Smith*, 140 S. Ct. 1575, 1579 (2020).

relying on that decision.

Unlike Schertz, the PUC Officials did raise the issue, albeit in the eleventh hour.[24] The PUC Officials do not (and frankly cannot) offer any persuasive reason why that position—which should have been obvious from the outset of the litigation—was not timely asserted. Though that limitation on § 1983's cause of action is non-jurisdictional,[25] the PUC Officials contend that we have the duty to correct this flaw in the judgment, which they maintain is "clearly at variance" with *Birchfield*. *Meadows v. Cohen*, 409 F.2d 750, 753 (5th Cir. 1969).

The PUC Officials correctly observe that *Birchfield*, 529 F.2d at 1253, held that municipalities and political subdivisions are not proper parties under § 1983.[26] Moreover, "neither a State nor its officials acting in their

---

[24] The PUC Officials did not assert this issue until they filed a Rule 60(b) motion, almost five months after final judgment. That Rule 60(b) motion is not part of the record on appeal, so asserting the position now is tantamount to raising it for the first time on appeal.

[25] Non-jurisdictional rules are subject to waiver and forfeiture. *See Nutraceutical Corp. v. Lambert*, 139 S. Ct. 710, 714 (2019).

[26] *Birchfield* rested on two independent justifications. First, applying *Monroe v. Pape*, 365 U.S. 167 (1961), the court found that municipalities were not proper § 1983 plaintiffs, given that they also were not subject to suit under that provision. *See Birchfield*, 529 F.2d at 1255. And second, "political subdivisions of states do not possess constitutional rights . . . in the same sense as private corporations or individuals." *Id*. at 1254.

We have not formally overruled *Birchfield*, though one of the rationales undergirding it has been abrogated. Only two years after *Birchfield*, the Supreme Court overruled *Monroe*, holding instead that under certain circumstances, municipalities can be sued under § 1983. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978). *Monell* did not address whether municipalities qualified as "any citizen of the United States or other person" such that they could be proper *plaintiffs*. 42 U.S.C. § 1983. But the implication of *Birchfield*'s rule post-*Monell* is that the word "person" means two different things in § 1983, even though we apply a "rule of thumb that a term generally means the same thing each time it is used" in a statutory provision. *United States v. Castleman*, 572 U.S. 157, 174 (2014) (Scalia, J., concurring in part and concurring in the judgment).

official capacities are 'persons' under § 1983." *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989). In other words, the PUC Officials are not proper § 1983 defendants either.

Ultimately, however, we need not decide whether to pull the PUC Officials back from the precipice. *Birchfield* stands as no obstacle to having this case proceed against the PUC Officials, because Green Valley has a cause of action against them *at equity*, regardless of whether it can invoke § 1983.[27] Because, as we discussed above, Green Valley has satisfied *Young*'s requirements, its suit for injunctive relief against the PUC Officials may go forward.

IV.

We turn to the merits. "We review . . . summary judgments *de novo*." *In re IntraMTA Switched Access Charges Litig.*, 961 F.3d 691, 713 (5th Cir. 2020).

Under the Consolidated Farm and Rural Development Act, the USDA is "authorized to make or insure loans" to rural water and sewer utilities for the "the conservation, development, use, and control of water . . . primarily serving farmers, ranchers, farm tenants, farm laborers, rural businesses, and other rural residents." 7 U.S.C. § 1926(a)(1). To ensure that federally indebted utilities repay their loans, Congress enacted a provision protecting utilities from curtailment and encroachment by municipalities and

---

Other circuits have recognized that municipalities may be proper § 1983 plaintiffs, even though they "receive[ ] no protection from the Equal Protection or Due Process Clauses vis-a-vis its creating state." *S. Macomb Disposal Auth. v. Twp. of Washington*, 790 F.2d 500, 505 (6th Cir. 1986). That approach may well be more faithful to § 1983's text than is *Birchfield*. But given that the parties do not ask us to overrule *Birchfield*, we leave it, as unnecessary to decide here, for another day.

[27] *See Young*, 209 U.S. at 149; *see also Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015) ("What our cases demonstrate is that, in a proper case, relief may be given in a court of equity to prevent an injurious act by a public officer.") (cleaned up)).

other public bodies.  That subsection states that

> [t]he service *provided or made available* through any such associ-
> ation shall not be curtailed or limited by inclusion of the area
> served by such association within the boundaries of any muni-
> cipal corporation or other public body, or by the granting of any
> private franchise for similar service within such area during the
> term of such loan . . . .

7 U.S.C. § 1926(b) (emphasis added).  At issue is the italicized "provided or
made available."

The panel in *North Alamo* interpreted that language, relying mainly on
state law.[28]  The panel correctly observed that, under Texas law, a CCN gives
a utility both (1) "the exclusive right to serve the area within its CCN" and
(2) an obligation "to serve every consumer within its certified area and ren-
der continuous and adequate service within the area . . . ." *N. Alamo*, 90 F.3d
at 915–16 (ellipsis omitted).  Based on that, the panel held that a utility's
"state law duty to provide service is the legal equivalent to . . . 'making
service available' under § 1926(b)." *Id.* at 916.  The only reasoning the panel
offered was that "[w]hen confronted with a similar issue, other courts have
reached the same result . . . ." *Id.* (citing only *Glenpool Util. Servs. Auth. v.
Creek Cty. Rural Water Dist. No. 2*, 861 F.2d 1211, 1214 (10th Cir. 1988)).

*North Alamo*'s state-law-duty rule finds no support in § 1926(b)'s
text, which is unsurprising given that the panel didn't analyze the statutory
language at all.  Because § 1926 and related statutory provisions do not define
"provided" or "made available," we afford those terms their "ordinary
meaning." *Taniguchi v. Kan Pac. Saipan, Ltd.*, 566 U.S. 560, 566 (2012).  To
"provide" ordinarily means "[t]o make available," "furnish," or "[t]o sup-

---

[28] *See N. Alamo*, 90 F.3d at 915–16.  The panel also found that the district court's
conclusion that North Alamo "ha[d] lines and adequate facilities to provide service to the
disputed areas" was not clearly erroneous. *Id.* at 916.

ply something needed or desired to."[29]  And "available" customarily means "[p]resent and ready for use; at hand; accessible" or "[c]apable of being gotten; obtainable."[30]

In other words, "[i]nherent in the concept of providing service or making service available is the *capability* of providing service, or, at a minimum, of providing service *within a reasonable time*."  *Sequoyah Cty. Rural Water Dist. No. 7 v. Town of Muldrow*, 191 F.3d 1192, 1203 (10th Cir. 1999) (emphasis added).  But under *North Alamo*, a utility can hang onto its government-sanctioned monopoly even if it does not serve anyone in its service territory or doesn't have the facilities to do so.

More consistent with the ordinary meaning of "provided or made available" is the so-called "pipes in the ground" or "physical ability" test.  That inquiry asks whether the utility has (1) "adequate facilities within or adjacent to the area to provide service to the area within a reasonable time after a request for service is made" and (2) the legal right to provide service. *Le-Ax Water Dist. v. City of Athens*, 346 F.3d 701, 706 (6th Cir. 2003).

Every other circuit to consider § 1926(b) has adopted some variation of the "physical capability" test.[31]  Texas courts have too.  *See, e.g.,*

---

[29] *Provide*, AMERICAN HERITAGE DICTIONARY, https://ahdictionary.com/word/search.html?q=provide (last visited Nov. 26, 2019); *see also Chesapeake Ranch Water Co. v. Bd. of Comm'rs*, 401 F.3d 274, 280 (4th Cir. 2005) ("'To 'provide' ordinarily means 'to make available,' to 'furnish,' to 'supply,' or to 'equip.'"").

[30] *Available*, AMERICAN HERITAGE DICTIONARY, https://ahdictionary.com/word/search.html?q=available (last visited Nov. 26, 2019); *see also Ross v. Blake*, 136 S. Ct. 1850, 1858 (2016) ("[T]he ordinary meaning of the word 'available' is capable of use for the accomplishment of a purpose,' and that which 'is accessible or may be obtained." (some quotation marks omitted)).

[31] *See Rural Water Sewer & Solid Waste Mgmt., Dist. No. 1, Logan Cty. v. City of Guthrie (RWS Dist. No. 1)*, 654 F.3d 1058, 1064–65 (10th Cir. 2011); *Pub. Water Supply Dist. No. 3 of Laclede Cty. v. City of Lebanon (PWS Dist. No. 3)*, 605 F.3d 511, 521–23 (8th Cir.

No. 18-51092

*Creedmoor-Maha Water Supply Corp. v. Tex. Comm'n on Envtl. Quality*, 307 S.W.3d 505, 522 (Tex. App.—Austin 2010, no writ). And *North Alamo*'s purported out-of-circuit support for its state-law-duty rule is illusory.[32] In short, we are all alone, and we are not leading the pack.

Undeterred, Green Valley counters with three points. First, it asserts that *North Alamo* was right on the merits, because Texas's duty requiring utilities to serve all customers in their territories provides an alternative means to make service available under § 1926(b). Second, and relatedly, Green Valley contends that there is no circuit split on that issue because of that unique state-law duty. And third, it maintains that Texas state law provides another means—"for cause" decertification—to hold recalcitrant utilities accountable.

But Green Valley wholly fails to grapple with § 1926(b)'s text.[33] Nor does it recognize that "allowing a water district to meet [§ 1926(b)'s] requirement simply by showing a legal duty to serve may undermine" § 1926(b)'s goal of "encourag[ing] water development by expanding the number of potential users of such systems." *Sequoyah*, 191 F.3d at 1203 (quoting *City of Madison v. Bear Creek Water Ass'n, Inc.*, 816 F.2d 1057, 1060 (5th Cir. 1987)).

---

2010); *Chesapeake Ranch*, 401 F.3d at 279; *Le-Ax Water*, 346 F.3d at 706.

[32] Contrary to what *North Alamo* suggests, "*Glenpool* did not expressly hold that Oklahoma water districts have a legal duty to provide service." *Sequoyah*, 191 F.3d at 1202. Instead, the utility in *Glenpool* satisfied § 1926(b), at least in part, "by virtue of its line adjacent to the property," that is, by having pipes in the ground. *Glenpool*, 861 F.2d at 1214.

[33] *See Sequoyah*, 191 F.3d at 1203 ("To hold that a legal duty is sufficient . . . would be contrary to the language of the statute."). *North Alamo* implicitly recognized as much. *See N. Alamo*, 90 F.3d at 916 ("We hold that the Utility's state law duty to provide service is the *legal equivalent* to the Utility's 'making service available' under § 1926(b)." (emphasis added)).

No. 18-51092

Green Valley cannot offer a persuasive reason why § 1926(b) should provide more protection to a federally financed utility in Texas than to a similarly financed utility in Mississippi or Louisiana, especially if *neither can provide service*. As a matter of common sense, a state-law duty to provide service is not the same as being physically able to provide it. Because § 1926(b)'s text requires the latter while our precedent requires the former, *North Alamo* must be overruled.

In *North Alamo*'s place, we adopt the "physical ability" test as articulated in *Le-Ax Water*, 346 F.3d at 705–07, albeit with one small alteration.[34] To make the test easy to apply to both water and sewer service, we hold that a utility must show that it has (1) adequate facilities to provide service to the area within a reasonable time after a request for service is made and (2) the legal right to provide service.[35] A utility cannot satisfy that test if it has no nearby infrastructure.[36] But "pipes in the ground" is a colloquial shorthand, not a strict requirement.[37] The test we adopt strikes the appropriate balance

---

[34] The other circuits that have applied this test have generally done so in the context of *water*, rather than *sewer*, service. *See, e.g., RWS Dist. No. 1*, 654 F.3d at 1061; *Chesapeake Ranch*, 401 F.3d at 277; *Le-Ax Water*, 346 F.3d at 703. That factual distinction matters, because the facilities required to furnish sewer service can differ from those for water.

[35] As in many other legal contexts, what makes facilities "adequate" or a time lag "reasonable" will likely depend on the facts and circumstances surrounding the particular request for service.

[36] *See PWS Dist. No. 3*, 605 F.3d at 523 ("We have not found any cases where a rural district has satisfied the 'physical ability to serve' requirement in the absence of any facilities whatsoever."); *cf. Lexington–S. Elkhorn Water Dist. v. City of Wilmore*, 93 F.3d 230, 238 (6th Cir. 1996) ("[A]n association's ability to serve is predicated on the existence of facilities within or adjacent to a disputed property."). Though the en banc court need not tease out exactly *what* facilities are necessary or precisely *how nearby* they must be located, the utility must have *something* in place to merit § 1926(b)'s protection.

[37] The parties' disagreement about "pump-and-haul" service crystallizes the problem with applying a strict "pipes in the ground" condition. "'Pump-and-haul' is a process

No. 18-51092

between fidelity to § 1926(b)'s text and recognition of the realities of making water or sewer service available.[38]

Because the district court, bound by *North Alamo*, relied exclusively on Green Valley's state-law duty to conclude that Green Valley had made service available, we vacate the portion of the judgment rendered in favor of Green Valley on its § 1926(b) claims. We remand for the district court to consider whether Green Valley satisfies the "physical capability" test in the first instance.[39]

---

by which human waste is stored on site, intermittently pumped out of a holding tank, and then hauled away." *United States v. Cty. of Culpeper*, No. 3:16-CV-00083, 2017 WL 3835601, at *1 n.1 (W.D. Va. Sept. 1, 2017). Though pump-and-haul service is generally meant to be a temporary stopgap, wastewater can be disposed of and treated under such a system. We need not decide whether the ability to furnish pump-and-haul means that a utility has "provided or made available" sewer service. But, at the very least, the ability to provide "pump and haul" service while more permanent infrastructure is installed is relevant to whether a utility has the "physical capability" to serve.

[38] The PUC Officials suggest that a utility has "made" service "available" only if it is "capable of immediate use." That is incorrect. Service may be "available" even if it cannot be immediately used. *See Ross*, 136 S. Ct. at 1858 (suggesting that a remedy is "available" if it "is accessible or may be obtained"). No water or sewer utility can make service immediately available to rural, undeveloped land; providing such service involves building or installing facilities, which necessarily takes time to accomplish. The cases on which the PUC Officials rely—which primarily involve funding, not infrastructure—do not alter that calculus. *See Tex. Educ. Agency v. U.S. Dep't of Educ.*, 908 F.3d 127, 133 (5th Cir. 2018) (funding); *Miller v. Norris*, 247 F.3d 736, 740 (8th Cir. 2001) (administrative remedy); *First Sec. Bank of N.M., N.A. v. Pan Am. Bank*, 215 F.3d 1147, 1156 (10th Cir. 2000) (funding); *Duncan v. United States*, 368 F.2d 98, 102 (5th Cir. 1966) (funding).

[39] *See Thacker v. Tenn. Valley Auth.*, 139 S. Ct. 1435, 1443 (2019) ("[W]e are a court of review, not of first view."). With *North Alamo* overruled, Green Valley's *North Alamo*-based cross-appeal for additional injunctive relief necessarily fails. And because we vacate and remand based on our overruling of *North Alamo*, it is unnecessary to address the parties' other theories supporting vacatur. Accordingly, we decline to consider (1) the PUC Officials' contentions that § 1926(b) governs only local regulation and (2) Schertz's request that we overrule *Cibolo*. But to the extent that *Cibolo* relied on *North Alamo*'s legal-duty test, that portion, of course, has now been abrogated.

No. 18-51092

\* \* \* \* \*

In sum, the en banc court rules as follows:

- We MODIFY the dismissal of Green Valley's preemption claim as to TWC § 13.254(a-1) to make it without prejudice, and we AFFIRM it as so modified.

- We VACATE the judgments invalidating the PUC's orders[40] and REMAND with instruction to dismiss those claims as barred by state sovereign immunity.

---

We remind the parties and the district court that before permanent injunctive relief can be awarded, a plaintiff must satisfy the traditional four-factor test. *See eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006). And "[w]hen crafting an injunction, district courts are guided by the Supreme Court's instruction that the scope of injunctive relief is dictated by the extent of the violation established." *ODonnell v. Harris Cty.*, 892 F.3d 147, 163 (5th Cir. 2018) (quotation marks omitted). Accordingly, a "court must narrowly tailor an injunction to remedy the specific action which gives rise to the order." *John Doe #1 v. Veneman*, 380 F.3d 807, 818 (5th Cir. 2004). Indeed, "an injunction must be vacated if it fails to meet th[ose] standards and is overbroad." *ODonnell*, 892 F.3d at 163 (5th Cir. 2018) (quotation marks omitted).

The district court enjoined Schertz "from providing wastewater service to the Schertz Acreage, absent Green Valley's consent, for so long as the Schertz Acreage remains within Green Valley's Sewer CCN[.]" That injunction is overbroad for two reasons. First, Green Valley is entitled to § 1926(b)'s protection only if it either provides service or makes it available. Yet, the injunction forbids Schertz from providing service for *any reason*, even if Green Valley refused to provide service and the PUC decertified the territory "for cause." Second, the injunction continues indefinitely, even though § 1926(b)'s protection exists only for the life of Green Valley's federal loan.

We offer no clue as to whether Green Valley may be entitled to injunctive relief under our new "physical capability" test. But any injunctive relief to which it might be entitled must be narrowly tailored to the protections that § 1926(b) provides.

[40] The following portions of the judgment are vacated: (1) the judgments invalidating "the GVDC Decertification Order and the Schertz Decertification Order . . . for interference with Green Valley's federal rights under § 1926(b)"; and (2) the judgments invalidating "any PUC orders recertifying the GVDC Tract or the Schertz Acreage . . . for interference with Green Valley's federal rights under § 1926(b)."

- We VACATE the remaining judgments related to the GVDC Order[41] and REMAND with instruction to dismiss those claims as moot.

- We OVERRULE *North Alamo Water Supply Corp. v. City of San Juan*, 90 F.3d 910 (5th Cir. 1996) (per curiam).

- We VACATE the judgments on Green Valley's § 1926(b) claims related to the Schertz Order and REMAND for further proceedings.[42]

We place no limitation on the matters that the conscientious district court may consider, consistent with this opinion, on remand. Nor do we suggest what decisions that court should make.

---

[41] The following portions of the judgment are vacated: (1) the judgment granted "in favor of [the] [d]efendants on Green Valley's claim that § 1926(b) preempts Texas Water Code § 13.254(a-6)"; (2) the judgment granted "in favor of Green Valley on Green Valley's § 1983 claims" as it relates to the GVDC Order; and (3) the judgement enjoining GVDC "from receiving wastewater service at the GVDC Tract from the City of Cibolo, absent Green Valley's consent, for so long as the GVDC Tract remains within Green Valley's Sewer CCN."

[42] The following portions of the judgment are vacated: (1) the judgment granted "in favor of Green Valley on Green Valley's § 1983 claims" as it relates to the Schertz Order; and (2) the judgment enjoining Schertz "from providing wastewater service to the Schertz Acreage, absent Green Valley's consent, for so long as the Schertz Acreage remains within Green Valley's Sewer CCN."

No. 18-51092

Priscilla R. Owen, *Chief Judge*, concurring in part and dissenting in part, in which Jones, Willett, Duncan, and Oldham, *Circuit Judges*, join as to parts II and III:

Green Valley Special Utility District (Green Valley) contends that, by virtue of 7 U.S.C. § 1926(b),[1] a federal loan it obtained in 2003 to provide only *water* service protects it from competition in that service area for *wastewater* service. When the federal loan was made for water service, Green Valley was not authorized under Texas law to provide *any* wastewater service in its water service area. Green Valley was required by Texas law to obtain a certificate of convenience and necessity for wastewater service, which it did not do until 2005. Green Valley did not obtain a federal loan under § 1926(a) to fund wastewater service. The record is also clear, and Green Valley has admitted,[2] that revenue from the wastewater services it provides is not pledged or otherwise encumbered to secure its federal loan for water service.

I would overrule the decision by a panel of this court in *Green Valley Special Utility District v. City of Cibolo*[3] and hold that § 1926(b)'s monopoly protection for "[t]he service provided or made available through any such

---

[1] 7 U.S.C. § 1926(b) provides:

**(b) Curtailment or limitation of service prohibited**

The service provided or made available through any such association shall not be curtailed or limited by inclusion of the area served by such association within the boundaries of any municipal corporation or other public body, or by the granting of any private franchise for similar service within such area during the term of such loan; nor shall the happening of any such event be the basis of requiring such association to secure any franchise, license, or permit as a condition to continuing to serve the area served by the association at the time of the occurrence of such event.

[2] *See* Requests for Admissions, ROA.2644.

[3] 866 F.3d 339, 342-43 (5th Cir. 2017).

27

association"[4] means that only the type of service for which a federal loan was obtained is shielded from competition. I would leave open the question of whether § 1926(b)'s monopoly power extends to a type of service that is different from the service for which the federal loan was granted, if the proceeds from the differing type of service have been expressly pledged or encumbered to secure the federal loan.

As noted, Green Valley did not obtain a federal loan under 7 U.S.C. § 1926(a) in order to provide wastewater service. Accordingly, Green Valley should not be protected from competitors in seeking to provide wastewater service to the 405-acre tract annexed by the City of Schertz. I would therefore reverse the district court's judgment as to the City of Schertz and render judgment in favor of the City.

The question of whether having "pipes in the ground," that is, *existing* facilities, "nearby" is a prerequisite to the protections of § 1926(b) would no longer be a live issue in this case, based on my construction of § 1926(b). There would be nothing further for the district court to decide since § 1926(b) would not apply to Green Valley's wastewater service. It is therefore unnecessary to consider whether the decision in *North Alamo Water Supply Corp. v. City of San Juan*[5] should be overruled. Since the court's majority opinion does reach the issue, I part company with that opinion's analysis to the extent it requires "pipes" to exist "in the ground," somewhere, at the time service is requested. Based on various provisions in § 1926, competition should be foreclosed if an association has a legal right to provide the service and can do so within a reasonable amount of time after a request for service is made. The "existing" "pipes" requirement engrafted

---

[4] 7 U.S.C. § 1926(b).

[5] 90 F.3d 910 (5th Cir. 1996) (per curiam).

No. 18-51092

on to § 1926(b) today eliminates the protections from competition afforded to a new association who has not yet placed a first "pipe in the ground" or an existing association with a newly-minted service area, even if the association is actively pursuing construction plans. It is unreasonable to construe § 1926(b) as stripping protections in such circumstances.

# I

The first of only two questions that the City of Schertz raises before the en banc court as an appellant is whether a prior opinion from a panel of this court, *Green Valley Special Utility District v. City of Cibolo*,[6] was correctly decided. The City of Schertz contends that "[t]he monopoly protections afforded by 7 U.S.C. § 1926(b) to the 'service provided or made available,' are limited to the service funded by the 7 U.S.C. § 1926(a) loan, contrary to this Court's prior opinion in *Cibolo*."[7] Today, the en banc court's opinion dodges this question, concluding in footnote 39 that it need not decide the issue.[8] With great respect, that disposition runs roughshod over principles of judicial economy and fairness.

The en banc court's judgment vacates the district court's judgment as to, and remands for further consideration of, Green Valley's contention that it has provided or made available wastewater service to the 405-acre tract within the City of Schertz's boundaries. If the City of Schertz is correct that § 1926(b)'s protections are limited to the type of service for which Green Valley received the federal loan, then the City of Schertz would be entitled to

---

[6] 866 F.3d 399 (5th Cir. 2017).

[7] "Appellants-Cross Appellees City of Schertz and Brian James' Supplemental En Banc Brief" at 12.

[8] *Ante* at 24 n.39 ("[B]ecause we vacate and remand based on our overruling of *North Alamo*, it is unnecessary to address the parties' other theories supporting vacatur. Accordingly, we decline to consider . . . Schertz's request that we overrule *Cibolo*.").

rendition of judgment in its favor in this court or an equivalent disposition, including a judgment vacating the district court's judgment with instructions to dismiss Green Valley's claims against the City of Schertz, and consequently instructions to dismiss claims against the Public Utility Commission (PUC) regarding its City of Schertz order. There would be nothing left for the district court to adjudicate. That is a decidedly more favorable outcome for the City of Schertz, and therefore, the en banc court must decide the issue if it is going to make a principled disposition of this appeal.

Instead, the en banc court requires the City of Schertz to return to the district court to litigate whether Green Valley has existing facilities "nearby" to provide wastewater service to the 405-acre tract. If the City of Schertz is unsuccessful, it will have to once again press the dispositive issue that it raises in this appeal in yet another appeal. Any future appeal would in all likelihood be heard by a panel, which would be bound by our precedent in *Cibolo*. The City of Schertz would then have to obtain en banc review. The en banc majority's opinion offers no explanation as to why it is requiring the City of Schertz to incur the cost of litigating an issue on remand, to potentially incur the cost of pursuing a second appeal, the outcome of which is pre-ordained by this court's precedent, and to run the risk that this court will not grant en banc review. This result is not only a waste of judicial and private resources,[9] it is also plainly unfair to the City of Schertz.

It is plainly unfair to the City of Schertz and a highly questionable judicial course of action for another reason. Green Valley is in the process of

---

[9] *See, e.g.*, *Nat. Gas Pipeline Co. of Am. v. Pool*, 124 S.W.3d 188, 201 (Tex. 2003) ("For reasons of judicial economy, this Court has long required that dispositive issues must be considered and resolved and that a judgment moving the case to the greatest degree of finality must be rendered.").

obtaining a federal loan under § 1926(b) for wastewater service. That fact may alter the course of further proceedings in this case because the City of Schertz would lose the ability to raise the *Cibolo* issue once again in our court. Once Green Valley is authorized to provide wastewater service in the 405-acre tract within the boundaries of the City of Schertz, the *Cibolo* issue presently before this en banc court will be off the table and cannot be asserted in a future appeal.

At the very least, the City of Schertz and the public deserve an explanation for the en banc court's aberrant decision to refuse to address a dispositive issue on appeal. But no explanation is forthcoming. Only silence.

We are here en banc. We bypassed normal review by a panel when we directly took the case en banc. We cut through a veritable forest of procedural issues in order to reach only one of the two merits issues that the City of Schertz asks us to decide. We should answer the question that would end the case, and which I submit, is more important than the only merits issue the court decides, which results in a remand rather than resolution.

## II

In order to determine whether the monopoly power bestowed by 7 U.S.C. § 1926(b) can extend to a type of service other than the type of service funded by the federal loan, we, of course, begin with the text of § 1926(b) and consider the text of § 1926 as a whole.[10]

The text of § 1926(b) says in part that "[t]he service provided or made available through any such association shall not be curtailed or limited." To what does "the service" refer? The term "service" is not defined in the

---

[10] *See 21st Mortg. Corp. v. Glenn (In re Glenn)*, 900 F.3d 187, 190 (5th Cir. 2018) (quoting *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012)).

statute. With one exception pertaining to broadband service,[11] the uses of "service" or "services" elsewhere within § 1926 are in distinctly different contexts that shed no light on the meaning of "the service" in § 1926(b).[12] It is at least debatable whether the monopoly provisions of § 1926(b) apply to the broadband service described in § 1926(a)(20)(E), but, in any event, it is clear from § 1926(b)'s text that it was intended to reach more that broadband "service."

So what else is there within § 1926 that helps us to discern the meaning of "[t]he service provided or made available through any such association"? If we look at the central operative provisions in § 1926(a) regarding a *particular* water, waste disposal, or wastewater facility grant to an association, we will see that the term "the project" is the key.[13] Leading up to subsection (3) regarding specific grants to an association, subsection (2) of § 1926(a) provides that "[t]he Secretary is authorized to make grants to such associations to finance *specific projects for works* for the development, storage, treatment, purification, or distribution of water or the collection, treatment, or disposal of waste in rural areas."[14] Then, subsection (3) of § 1926(a)

---

[11] *See* 7 U.S.C. § 1926(a)(20)(E) ("Notwithstanding subparagraph (C), the Secretary may make grants to State agencies for use by regulatory commissions in states with rural communities without local broadband service to establish a competitively, technologically neutral grant program to telecommunications carriers or cable operators that establish common carrier facilities and services which, in the commission's determination, will result in the long-term availability to such communities of affordable broadband services which are used for the provision of high speed Internet access.").

[12] *See, e.g.*, *id.* § 1926(a)(2)(B)(i)(II) ("The Secretary may make grants to qualified private, nonprofit entities to capitalize revolving funds for the purpose of providing financing to eligible entities for . . . short-term costs incurred for replacement equipment, small-scale extension services, or other small capital projects that are not part of the regular operations and maintenance activities of existing water and wastewater systems.").

[13] *Id.* § 1926(a)(3).

[14] *Id.* § 1926(a)(2)(A)(i) (emphasis added).

directs that "[n]o grant shall be made under paragraph (2) of this subsection in connection with any project unless the Secretary determines that *the project* [meets certain requirements]."[15]

The statute further provides that "[t]he term 'project' shall include facilities providing central service or facilities serving individual properties, or both."[16]  This language tells us that it is possible that a federal loan grant can be made for more than one type of facility (central or serving individual properties) and does not exclude the possibility that more than one type of service (water and wastewater service) may be included within a single "project."  The most natural reading of "[t]he service provided or made available through any such association" in § 1926(b) is that it refers to "[t]he service" provided or made available in accordance with "the project" for which federal funds were granted under § 1926(a)(3).[17]

The text of § 1926(a)(3) provides another compelling reason for concluding that only a service for which federal funding is provided under § 1926(a) is entitled to the monopoly protection extended by § 1926(b).  No loan can be made (and accordingly, no monopoly power can be granted) unless at least three findings are made at the federal level in accordance with § 1926(a)(3).  These are that "the project":

- "(i) will serve a rural area which, if such project is carried out, is not likely to decline in population below that for which the project was designed,"
- "(ii) is designed and constructed so that adequate capacity will or can be made available to serve the present population of the area to the

---

[15] *Id.* § 1926(a)(3) (emphasis added).

[16] *Id.* § 1926(a)(4)(B).

[17] *Id.* § 1926(b).

extent feasible and to serve the reasonably foreseeable growth needs of the area, and"

- "(iii) is necessary for an orderly community development consistent with a comprehensive community water, waste disposal, or other development plan of the rural area."[18]

Construing § 1926(b) to grant a monopoly for a service that is not the same type of service as the service for which the federal loan was granted allows an association like Green Valley to bypass completely these requirements. Under our court's decision in *Cibolo*, associations are able to obtain monopoly power in their *water* service areas for *wastewater* services without meeting the requirements of § 1926(a)(3). The same is true if associations have received federal loans only for wastewater. They may obtain monopoly power for water service without federal authorization of that service and the prerequisite findings required by § 1926(a)(3).

It is difficult to believe that Congress intended such a statutory scheme. If Congress thought that it was necessary for an association to maintain its service area intact for services other than the service for which the loan was provided, it would have directed that proceeds from such other services be dedicated at least in part to servicing the federal loan. It did not. Reading § 1926(b) as the court does to foreclose competition in such a backhanded way is tantamount to concluding that Congress has hidden an elephant in a mousehole.[19] Congress "does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions."[20]

The provision of water service is a different animal than the provision of wastewater service, as the record in the present case confirms. A provider

---

[18] *Id.* § 1926(a)(3).

[19] *See, e.g.*, *Whitman v. Am. Trucking Ass'ns, Inc.*, 531 U.S. 457, 468 (2001).

[20] *Id.*

of water service must have a source or means of supplying potable water for residential and other users.  The facilities by which potable water is delivered are not the same facilities that would be used to carry wastewater away from residential or other properties.  The number of customers who desire water service may be very different than the number of customers who desire wastewater service, and present and future demands for a service are key factors under § 1926(a)(3).  For example, the amicus brief of North Alamo Water Supply Corporation tells us that currently, it has approximately 49,000 water meters through which it provides water service, compared to its 3,600 wastewater connections.[21]   Meeting the requirements under § 1926(a)(3) for one type of service does not mean that the requirements for another type of service are met.

In *Cibolo*, the panel found persuasive the wastewater provider's argument that its wastewater service was "integrated" with its water service, concluding that "Congress's use of 'the' in § 1926(b) . . . is consistent with 'service' referring to an integrated water-and-sewer service."[22]   But the service was not so "integrated" that the provider in *Cibolo*, who coincidentally was Green Valley, included a request for federal funds for providing wastewater in its request for federal funds for water service.  Indeed, Green Valley could not have done so.  Green Valley was not authorized to provide *any* wastewater services in 2003 when it obtained a federal loan for water services—the same federal loan at issue in both *Cibolo* and the present appeal.  There could not have been a determination by a federal administrator under § 1926(a)(3) that wastewater service proposed to be provided by Green Valley, many years after the water service loan closed,

---

[21] *See* "Unopposed Brief for Amicus Curiae North Alamo Water Supply Corporation in Support of Plaintiff-Appellee Cross Appellant" at 7-8.

[22] *Green Valley Special Util. Dist. v. City of Cibolo*, 866 F.3d 339, 342 (5th Cir. 2017).

was so "integrated" with its water service that "the service" under § 1926(b) should be deemed to include the wastewater service.

Even assuming that a court could take upon itself the role of deciding whether a different-in-kind service was so "integrated" with the service for which a federal loan was granted that it should come within the protections of § 1926(b), the only evidence of integration that the panel opinion in *Cibolo* cited was Green Valley's assertion that "its water and sewer services share employees, a board of directors, a general manager, and an operating account."[23] That is no evidence whatsoever to justify extending monopoly power. It is no evidence that the wastewater services are *so integrated with water service* that the statutory *reasons* for granting monopoly power are present. I come back, once again, to the requirements under § 1926(a)(3) that justify conferring the cloak of protection from competition under § 1926(b). Sharing employees, management, and an operating account says nothing about whether the wastewater service

> (i) will serve a rural area which, if such project is carried out, is not likely to decline in population below that for which the project was designed, (ii) is designed and constructed so that adequate capacity will or can be made available to serve the present population of the area to the extent feasible and to serve the reasonably foreseeable growth needs of the area, and (iii) is necessary for an orderly community development consistent with a comprehensive community water, waste disposal, or other development plan of the rural area.[24]

---

[23] *Id.* at 342 n.7.

[24] 7 U.S.C. § 1926(a)(3).

It is these criteria, among others, that Congress has said justify the monopoly power granted by § 1926(b).  Congress did not say that if you provide a service that meets these requirements, you can later tack on other, different types of services and obtain monopoly power with no further showing at the federal level.  Although Congress certainly has an interest in protecting a federal loan recipient's ability to repay a loan, there is no indication that Congress intended a loan recipient who provides water service, for example, to exclude all providers of wastewater services from its water service area.

This court's decision in *Cibolo* did not consider § 1926(a)(3) at all, much less its express definition of a "project" as potentially including more than one type of service.  Nonetheless, the *Cibolo* decision correctly stated (for the wrong reason) that "if 'service' [in § 1926(b)] refers to a specific service, it must be possible to read it as referring to more than one service."[25] The *Cibolo* decision's *reasoning* in this regard veered off the rails in the next sentence when it said, "[o]therwise, if an association received federal loans [plural] for both its water and sewer service, only one of them would be able to receive § 1926(b)'s protection."[26]  This is obviously incorrect.  If two separate loans were granted, one for water and another for wastewater, each loan would independently give rise to the protections of § 1926(b).  If the *Cibolo* decision *meant* to say that if an association received *a single loan* for both its water and sewer service, only one of them would be able to receive § 1926(b)'s protections, that too would be incorrect.  As discussed above, a

---

[25] *Cibolo*, 866 F.3d at 342.

[26] *Id.*

"project" for which a loan is granted can include more than one type of service.[27]

The linchpin of the *Cibolo* decision's ultimate conclusion comes in its next sentence, which reveals both a gap in logic and an unawareness of the statutory scheme:  The decision notes that "[i]f 'service' refers to a specific service but can be used iteratively, then both Green Valley's water and sewer service can be examples of '[t]he service made available through any such association.'"[28]  But the term "the service" can only be used "iteratively" in the context of § 1926(a)(3), which employs the concept of "the project." It is only when "the project" for which a loan is granted involves more than one type of service that "the service" as used in § 1926(b) may be "iterative."[29]  There is no textual basis for concluding that "the service provided or made available" within the meaning of §  1926(b) is "iterative" for services that are not part of "the project" for which a federal loan is approved.

The text of § 1926(b) also expressly refers to "[t]he service provided or made available *through* any such association."[30]  It does not say service provided or made available *by* "any such association."[31]  The monopoly power granted in § 1926(b) lasts only "during the term of such loan."[32] Taken together, the requirements that "the service" must be provided

---

[27] *See* 7 U.S.C. § 1926(a)(4)(B) ("The term 'project' shall include facilities providing central service or facilities serving individual properties, or both.").

[28] *Cibolo*, 866 F.3d at 342 (second alteration in original).

[29] *See* 7 U.S.C. § 1926(a)(4)(B) (defining "project").

[30] *Id*. § 1926(b) (emphasis added).

[31] *See id.*

[32] *Id*.

"through," not just by, the association, and that § 1926(b) applies only during "the term of such loan," strongly imply that the monopoly power is only granted for the type of service for which federal loan funds have been or are being passed "through" the association.

The Eighth Circuit has considered how to construe § 1926(b), ultimately holding "we interpret 'the service provided or made available' to be limited to the financed service."[33] In that case, an association had obtained a loan under 7 U.S.C. § 1926(a) for extending and improving its sewer system.[34] That association asserted "that the USDA loan also triggers § 1926(b) protection with respect to . . . water service."[35] The Eighth Circuit concluded that "divorcing the type of service underlying a rural district's qualifying federal loan from the type of service that § 1926(b) protects would stretch the statute too far."[36]

We should not hesitate to overrule *Cibolo*. It did not consider all of the nuances in § 1926(b), and *Cibolo* wholly failed to consider the barriers erected by § 1926(a)(3) to the attainment of monopoly power.

It should also be noted that in considering the petition for writ of certiorari filed in *Cibolo*, the Supreme Court called for the views of the Solicitor General.[37] The Solicitor General took the position that our court's *Cibolo* "decision is incorrect and contrary to the decision of another court of

---

[33] *Pub. Water Supply Dist. No. 3 v. City of Lebanon*, 605 F.3d 511, 521 (8th Cir. 2010) (quoting 7 U.S.C. § 1926(b)).

[34] *Id*. at 514.

[35] *Id*. at 519.

[36] *Id*. at 521.

[37] *See* "Brief for the United States as Amicus Curiae," *City of Cibolo. v. Green Valley Special Util. Dist.*, 2018 WL 6382969 (2018) (No. 17-938).

appeals."[38]  The Solicitor General asserted that "[t]he court of appeals erred in construing '[t]he service' in Section 1926(b) as referring to any service provided or made available through an association, regardless of whether that service is funded by a Section 1926(a) loan."[39]

Among the reasons given to support his position, the Solicitor General offered these observations, which I quote fully in the interest of accuracy and attribution:

> The first sentence of Section 1926(a)(1) provides the answer. *See Jones v. United States*, 527 U.S. 373, 389 (1999) ("Statutory language must be read in context and a phrase 'gathers meaning from the words around it.'") (citation omitted).  That sentence states:
>
>> The Secretary is *** authorized to make or insure loans to associations, including corporations not operated for profit, Indian tribes on Federal and State reservations and other federally recognized Indian tribes, and public and quasi-public agencies to provide for the application or establishment of soil conservation practices, shifts in land use, the conservation, development, use, and control of water, and the installation or improvement of drainage or waste disposal facilities, recreational developments, and essential community facilities including necessary related equipment, all primarily serving farmers, ranchers, farm tenants, farm laborers, rural businesses, and other rural residents, and to furnish financial

---

[38] *Id*. at *9.

[39] *Id*.

assistance or other aid in planning projects for
such purposes.

7 U.S.C. 1926(a)(1).  Section 1926(a)(1) thus authorizes the
Secretary to make loans to "associations" to "provide for" a
particular service, such as "water" or "waste disposal" (i.e.,
sewer) service.  *Ibid*.  When Section 1926(b) is read together
with Section 1926(a)(1), the meaning of "[t]he service"
becomes clear:  "The service" refers to the service
"provide[d] for" (i.e., funded) by a loan under Section
1926(a)(1).

Other statutory indicators support that reading.  Section
1926(b) refers to "[t]he service provided or made available
through *any such association*."  7 U.S.C. 1926(b) (emphasis
added).  The word "such" means "of the sort or degree
previously indicated."  *Webster's Third New International
Dictionary of the English Language* 2283 (1981).  The phrase
"such association" in Section 1926(b) thus refers naturally to
one of the "associations" previously described in the first
sentence of Section 1926(a)(1).  It follows that "[t]he service"
in Section 1926(b) should be read in light of that sentence as
well.

The relevant statutory history reinforces that conclusion.  The
provisions that are now codified as Section 1926(a)(1) and (b)
were enacted in 1961 as Section 306(a) and (b) of the
[Consolidated Farmers Home Administration Act].  *See* § 306,
75 Stat. 308; p. 2, supra.  As originally enacted, the provision
authorizing loans for particular services and the provision
protecting "[t]he service provided or made available" were
separated by only a single sentence. § 306, 75 Stat. 308.  A
reader would thus have naturally read the two provisions
together, understanding "[t]he service" to refer to the service
that was the subject of a loan.  Although Congress has since
added dozens of paragraphs to Section 1926(a), *see* 7 U.S.C.
1926(a)(1)-(26) (2012 & Supp. V 2017), Congress has not
modified Section 1926(b) or its relationship to the first

No. 18-51092

sentence of Section 1926(a)(1). "The service" in Section 1926(b) thus retains the same meaning it had in 1961: the service funded by a Section 1926(a) loan.

In reaching a contrary conclusion, the court of appeals relied on the statute's purposes, reasoning that construing "[t]he service" to mean any service that respondent provides would give respondent greater protection from "municipal encroachment." Pet. App. 8a. But "no legislation pursues its purposes at all costs." *Rodriguez v. United States*, 480 U.S. 522, 525-526 (1987) (per curiam). And extending Section 1926(b)'s territorial protection to services not funded by a federal loan may well discourage the very development in rural areas that Congress sought to foster, by "prohibit[ing] cities from providing [such] services to customers within a district's boundaries even when the city is perhaps better situated to do so." *Public Water Supply Dist. No. 3 v. City of Lebanon*, 605 F.3d 511, 520 (8th Cir. 2010). In any event, the court's reliance on the statute's purposes was misplaced, where, as here, the statute's text and history make clear that "[t]he service" refers to the service funded by a Section 1926(a) loan.[40]

Because the en banc court today declines to consider whether to overrule *Cibolo* in this regard, and the City of Schertz and the PUC would be entitled to a more favorable judgment if *Cibolo* were overruled, I respectfully dissent in part.

### III

As a factual matter, all agree that Green Valley has not obtained a federal loan under 7 U.S.C. § 1926(a) to fund any part of its wastewater services. The record also reflects that Green Valley's proposed wastewater

---

[40] *Id.* at *10-12.

treatment plant is not being constructed with any other federal loans, federal guarantees, or federally backed bonds.[41]

Nor do any revenues from wastewater services provided by Green Valley secure the federal loan under 7 U.S.C. § 1926 for its water services. The bonds that Green Valley issued to repay the federal loan obtained under § 1926 for water service reflect that they specifically exclude revenue from a sewer system.[42]   Similarly, in requests for admission in the present case, Green Valley admitted that its "federal loan is not secured by revenues received from wastewater collection services."[43]   Accordingly, there is no viable basis, I submit, for shielding Green Valley's wastewater services under § 1926(b) from competition.

## IV

Were I writing for a majority of the court, the question of whether Green Valley has "provided or made available" wastewater service to the 405-acre tract within the City of Schertz's boundaries would no longer be a live issue because, in my view, Green Valley's wastewater service is not protected at all, as matter of law, by 7 U.S.C. § 1926(b).  But the en banc court does not address that issue,[44] as noted above.  Instead, it addresses the request by the City of Schertz and others that we overrule a prior decision of

---

[41] ROA.2931.

[42] The bonds provide that Green Valley "covenants and agrees that its Net Water System Revenues are hereby pledged for repayment of the Bonds."  ROA.3150.  The term "Net Water System Revenues" is defined to include "all gross revenues of the District Water System" with reservations not pertinent here.  ROA.3142.  But the definition of "Water System" provides that it "shall not include any . . . sanitary sewer system."  ROA.3143.

[43] ROA.2644.

[44] *See ante* at 24 n.39.

our court, *North Alamo Water Supply Corp. v. City of San Juan*,[45] regarding how to determine if "the service" has been "provided or made available" within the meaning of § 1926(b), even though "the service" at issue is not the same type of service for which a federal loan was obtained under § 1926.[46]

The en banc court's decision today overrules *North Alamo* in part and offers guidance as to how § 1926(b) should be construed. The following is the core holding in the en banc court's opinion:

> [W]e hold that a utility must show that it has (1) adequate facilities to provide service to the area within a reasonable time after a request for service is made and (2) the legal right to provide service. A utility cannot satisfy that test if it has no nearby infrastructure. But "pipes in the ground" is a colloquial shorthand, not a strict requirement. The test we adopt strikes the appropriate balance between fidelity to § 1926(b)'s text and recognition of the realities of making water or sewer service available.[47]

The court's majority opinion observes in a footnote that "[a]s in many other legal contexts, what makes facilities 'adequate' or a time lag 'reasonable' will likely depend on the facts and circumstances surrounding the particular request for service."[48] Another footnote concludes that "[t]hough the en banc court need not tease out exactly *what* facilities are necessary or precisely *how nearby* they must be located, the utility must have *something* in place to merit § 1926(b)'s protection."[49]

---

[45] 90 F.3d 910 (5th Cir. 1996).

[46] *See ante* at 19-24, Part IV.

[47] *Ante* at 23-24 (citations and footnotes omitted).

[48] *Ante* at 23 n.35.

[49] *Ante* at 23 n.36 (emphasis in original).

I agree that the text "[t]he service provided or made available through any such association," found in 7 U.S.C. § 1926(b), contemplates that the association is or will be able to provide service to the area within a reasonable time after a request for service is made, and that the association has the legal right to provide that service. My basic disagreement with the en banc court's opinion is its requirement that "the utility must have something in place to merit § 1926(b)'s protection,"[50] and similarly, that "[a] utility cannot satisfy that test if it has no nearby infrastructure."[51] This engrafts upon § 1926(b) requirements that the text does not support.

First, the concept of "nearby" cannot be found in § 1926. To the contrary, that concept is expressly rejected. The requirement that facilities be "nearby" necessarily means that the nearby facilities must be capable of extension and therefore, that that the request for new service must be satisfied by *interconnecting with existing* facilities. But § 1926(a)(2)(A)(i) authorizes a loan "to finance specific projects for works," and § 1926(a)(4)(B) says that "[t]he term 'project' shall include facilities providing central service or facilities serving individual properties, or both." This scuttles any notion that interconnection of facilities is required in order for the protections of § 1926(b) to apply. Why would Congress authorize a loan for facilities scattered throughout an association's service area, including standalone facilities, but limit the monopoly protection to only interconnected facilities? The obvious answer is that it would not and did not.

Similarly, § 1926(a)(3)(ii) provides that a loan cannot be made unless the project will or can serve not only present needs in a rural area, but

---

[50] *Ante* at 23 n.36 (emphasis omitted).

[51] *Ante* at 23.

reasonably foreseeable future growth needs as well.    The statute contemplates "that adequate capacity *will or can be made available* to serve the present population of the area to the extent feasible and to serve the reasonably foreseeable growth needs of the area."[52]   This means that additional capacity can or will be added or made available at "facilities providing central service," "facilities serving individual properties, or both."[53]   Additional capacity does not have to be provided through interconnected facilities.  It can be provided through new facilities.

Second, and also critically, the requirement that there must be facilities in place before the protections of § 1926(b) materialize would permit a municipal corporation or a private landowner seeking a private franchise for similar service to strip all or part of a recently formed association's service area when the ink on the association's federal loan is barely dry, a certificate of convenience and necessity has been obtained from the appropriate state agency, and designs and construction plans have been finalized.  The association could lose portions of its service area simply because no facilities have yet been constructed.  Congress would not have left such a gaping hole in its statutory scheme to provide loan-repayment protections.  The issue should not be whether there are actually facilities in place, but whether the requested service can be provided within a reasonable time.

The language "shall not be curtailed or limited" in § 1926(b) does not change this analysis.  Service that is authorized and that can be commenced within a reasonable time is service that is "made available."  That service is

---

[52] 7 U.S.C. § 1926(a)(3)(ii) (emphasis added).

[53] *Id.* § 1926(a)(4)(B).

"limited" if the area that was to be served is stripped away before the service can commence.

Provisions in § 1926 clearly reflect that the rural area to be served is to be considered as a whole, not as a pie that can be divided up by competitors unless the association immediately builds enough facilities throughout the rural area such that every tract within its service area will be "nearby" when new needs arise.  Yet, by interjecting the "nearby" and "existing facilities" requirements, the en banc court's decision allows competitors to strip away parts of a service area for the same type of service for which the association has obtained a federal loan before *any* service for which the loan was made can *possibly* commence in *any* part of the service area.

Green Valley's water service area covers approximately 76,000 acres. That is almost 119 square miles.  Requiring Green Valley to build facilities throughout that vast service area such that it has facilities "nearby" enough to meet requests for service throughout this area or else lose parts of that area to competitors is a tall order.  It would be an extremely expensive and, most importantly, *uncertain* undertaking.  How many providers to rural areas will risk spending the enormous costs of infrastructure not knowing whether they have installed enough facilities in the places that will be deemed "nearby"?

The en banc court attempts to ameliorate the tremendous uncertainty it injects by adding the "nearby" requirement.  In a footnote, the en banc court's opinion states the following:

> The PUC Officials suggest that a utility has "made" service "available" only if it is "capable of immediate use."  That is incorrect.  Service may be "available" even if it cannot be immediately used.  *See Ross*, 136 S. Ct. at 1858 (suggesting that a remedy is "available" if it "is accessible or may be obtained").  No water or sewer utility can make service immediately available to rural, undeveloped land; providing

such service involves building or installing facilities, which necessarily takes time to accomplish.[54]

With respect, this is unhelpful in ascertaining how "nearby" is "nearby" enough.

By reading into the text of § 1926(b) the requirement that there must be existing facilities that are "nearby," the en banc court has injected a factor that will most certainly lead to arbitrary and widely varying results. Again, Green Valley's water service area covers approximately 76,000 acres. The tract at issue has 405 acres that were being used to grow crops with no residence on it at the time the PUC issued its order. There is a lot of room for interpretation as to the meaning of "nearby." Too much room for interpretation, I submit.

## V

I otherwise concur in Parts I, II, and III of the en banc court's opinion.

\* \* \* \* \*

I respectfully concur in part and dissent in part.

---

[54] *Ante* at 24 n.38.

No. 18-51092

EDITH H. JONES, Circuit Judge, joined by WILLETT, DUNCAN, and OLDHAM, Circuit Judges, concurring in Judge Smith's opinion and in part in Chief Judge Owen's opinion:

With deep respect to my colleagues, I concur in both Judge Smith's decision overturning the *North Alamo* case and the resulting judgment and in Chief Judge Owen's opinion to the extent it would overturn the *Cibolo* decision. I explain briefly why I believe overruling both cases is compelled and judicially proper, and I emphasize the limitations of the judgment imposed here.

1. This case was separately appealed by the City of Schertz and the members of the Texas Public Utility Commission, both of which had been enjoined by the district court. The district court's judgment revoked Schertz's CCN for the 405-acre tract within its boundaries that had previously been encompassed by Green Valley's CCN, and ordered the PUC to retransfer the CCN to Green Valley.

In appealing, the defendants had different goals. To reverse the loss of its CCN for wastewater service, Schertz had two options. It could persuade this court to overrule the *Cibolo* case, which extended Green Valley's claim of monopoly protection for its federal water service loan, granted by 7 U.S.C. § 1926(b), to a merely hypothetical provision of wastewater service not covered by that loan. Or it could ask this court to overrule the *North Alamo* case, which held that such a federally protected rural utility "provided or made available" utility service to customers solely by virtue of a state-issued CCN and irrespective of the actual provision of services.

The PUC, in contrast, wanted to maintain the integrity of Texas's complex and carefully structured Texas Water Code. The PUC acted under its regulatory authority here and excised this small tract in the City of Schertz from Green Valley's wastewater CCN only after finding that the rural utility

neither provided nor could provide sewer service in that tract.  The state's objective, in this case and for the broader purpose of preserving regulatory authority to assure water and wastewater service in the public interest, could be fulfilled only by overruling *North Alamo*.  It is immaterial to the state how the claim of federal monopoly protection for Green Valley's service claim arose, whether from a direct loan for a certain type of service or from *Cibolo*'s novel extension beyond the actual federal loan for water service; consequently, the state neither briefed nor argued concerning *Cibolo*.

This court can and should resolve both litigants' appeals.  This is not a classic case, as articulated by the Chief Judge, in which deciding one issue necessarily renders the other moot.  But even if it were, whether to reach the additional issue is a matter of prudence, not jurisdiction.  *Compare McGirt v. Oklahoma*, No. 18-9526, 2020 WL 3848063, at *39 (U.S. July 9, 2020)(Thomas, J.)(agreeing with Chief Justice's dissent but separately contending the Court lacked jurisdiction); *June Med. Servs. L.L.C. v. Russo*, No. 18-1323, 2020 WL 3492640, at *34 (U.S. June 29, 2020)(Thomas, J)("Even if the plaintiffs had standing, the Court would still lack the authority to enjoin Louisiana's law, which represents a constitutionally valid exercise of the State's traditional police powers").  Accordingly, while it is correct that a decision by this court overruling *Cibolo* would authorize judgment in favor of both appellants, such a narrow focus would not aptly respond to the questions raised by the state's appeal relevant to the *North Alamo* case.

2.  I have nothing to add to Judge Smith's excellent discussion of the issues preceding and culminating in the overruling of *North Alamo*, and likewise I cannot improve upon Chief Judge Owen's cogent explanation why this court's decision in *Cibolo* was unsupported by a proper reading of 7 U.S.C. § 1926(a) and (b).

3. The limitations of the majority opinion overruling *North Alamo* need to be noted, however. This court's decision does not forecast inevitable conflict between the PUC in its application of the Texas Water Code and rural utilities that have federal loans pursuant to Section 1926.

First, this case will be controlled by its facts on remand. The PUC administrative record supporting the decertification of Green Valley's wastewater CCN was admitted in the district court. Green Valley does not challenge the PUC's findings that, in this tract comprising less than 1% of its territory, Green Valley had no infrastructure for waste removal, had made no investments in the Schertz tract or outside of it for that purpose, had no existing loans or debt service related to the design or construction of sewer service, and of course, had no lost revenue stream for a non-existent service. The PUC expressly found that Green Valley had notified the PUC of any lienholders and the amount of outstanding debts, and the PUC notified Green Valley's lienholders of the Schertz proceeding. The utility's efforts to begin building a wastewater treatment plant were in their infancy and in any event were not situated to serve the Schertz tract. The only evidence about Green Valley's ability to offer temporary "pump and haul" service to any customers surfaced in depositions for this case taken after the PUC ruling. Those agreements pertained to customers in a different part of the utility's territory who would be eventually connected by pipeline to a San Antonio-owned treatment plant, a plant not feasibly accessible from the Schertz tract. The district court should not find it difficult to decide whether Green Valley has "adequate facilities to provide service to the area within a reasonable time after a request for service is made," as the en banc court's formulation of the "physical capability" test under Section 1926(b) now requires.

Second, proper application of the Texas Water Code need not conflict with the strictures of Section 1926(b). As applied here, Section 13.255(a)

specifies, generally, that if a municipality annexes or incorporates an area already served by a water or wastewater utility holding a CCN and wishes to provide the service itself, it may petition the PUC and the CCN "shall" be granted.[1]  However, the PUC is required to determine whether any property of the retail public utility would thereby be rendered "valueless or useless," and  it shall award adequate and just compensation for the loss of property as well as damages for the property retained by the utility.  TWC § 13.255(c), (g).  Subsection (g) extensively describes the items for which compensation may be sought and, significantly, includes the "impact on existing indebtedness of the retail public utility and its ability to repay that debt" and "factors relevant to maintaining the current financial integrity of the retail public utility…."[2]  It is possible to conceive of cases in which the PUC could award a CCN to a municipality under this provision and essentially monetize the repayment of some or all of the rural utility's federal indebtedness.  In any event, the final PUC decision is reviewable de novo in state courts, which would have to enforce Section 1926(b) pursuant to the Supremacy Clause. TWC § 13.255(e).

Third, neither Green Valley nor the district court, much less this en banc court anticipates that our decision will interfere with the PUC's ability to decertify a rural utility's CCN "for cause."  As the district court put it, the PUC could still revoke or amend a CCN when, "to the extent a utility does not fulfill its state law duty to provide continuous and adequate service

---

[1] The statute also authorizes the municipality and current holder of a CCN to make agreements for a transfer of service and delays any mandatory transfer hearing for 180 days in furtherance of negotiations.  TWC § 13.255(b).  The record shows that Green Valley had made several such agreed transfers in the past.

[2] The compensation requirement explains, in part, the PUC's extensive findings concerning the impact on Green Valley's assets and finances referenced in the preceding section.

under [TWC] § 13.250(a), that utility has not provided or made available service under Section 1926(b) and [it] is not entitled to federal protection of its service area." And Green Valley states, "What [*North Alamo*, 90 F.3d at 916] meant was that *if* the Utility was not yet factually making service available, *the PUC should have the first opportunity to correct the situation,* and thus, until the PUC intervenes and decertifies a CCN *for cause* (*i.e.*, for not actually making service available after a request and within a reasonable time), the federal courts need not step in and review the factual adequacy of the service provided for purposes of a Section 1926(b) review." (second emphasis added).

With these observations, I concur in full in Judge Smith's opinion and resulting judgment and in Chief Judge Owen's opinion to the extent noted.

No. 18-51092

Jennifer Walker Elrod, *Circuit Judge*, concurring, joined by Higginson and Costa, *Circuit Judges*:

I concur in full in Judge Smith's thorough opinion. I write to briefly discuss Judge Oldham's concurring opinion. The concurring opinion ponders what the Framers would "think about an implied cause of action to challenge state law as preempted." While interesting and well-researched, I think it presents somewhat of a red herring. The good news is that we do not have to worry about that problem in this case. The majority opinion does not allow Green Valley to challenge any state law as preempted,[1] and Green Valley need not rely on an "implied" cause of action.[2] That is good news indeed, because we must be careful when, without the benefit of adversarial briefing from the parties, we worry over hundred-year-old Supreme Court precedent that the parties have not challenged.[3]

Turning to the interesting problems posed by the concurrence, and putting aside questions of whether *Ex parte Young* itself created a new federal or implied cause of action,[4] the concurring opinion overlooks a simpler

---

[1] *See* Majority Op. at 13 ("[W]e do not have jurisdiction to consider Green Valley's preemption claims.").

[2] The cause of action that Green Valley asserts is not "implied," because it exists in the body of equitable doctrine in the same way that a cause of action for breach of contract is not "implied" from the contract but exists in the body of common law. And the court did not *sua sponte* supply a cause of action: Green Valley pleaded it, and a complaint need not include "magic words*." St. Paul Mercury Ins. Co. v. Williamson*, 224 F.3d 425, 434 (5th Cir. 2000).

[3] *Cf. United States v. Sineneng-Smith*, 140 S. Ct. 1575, 1579 (2020) ("[A]s a general rule, our system 'is designed around the premise that [parties represented by competent counsel] know what is best for them, and are responsible for advancing the facts and argument entitling them to relief." (second alteration in original) (quoting *Castro v. United States*, 540 U.S. 375, 386 (2003) (Scalia, J., concurring in part and concurring in the judgment))).

[4] *But cf.* John Harrison, *Ex parte Young*, 60 Stan. L. Rev. 989, 1014 (2008)

No. 18-51092

potential resolution of the *Ex parte Young* riddle.   A plaintiff seeking to restrain a state official from violating federal law can rely on state equity doctrine for its cause of action, and (in appropriate cases) federal ingredient jurisdiction to get into federal court.

State equity law provides a cause of action.[5]

Federal ingredient jurisdiction supplies subject-matter jurisdiction.[6]

Problem solved.

---

(observing that "[a]t the time of *Young* [the cause of action] was probably not even federal, though in light of *Erie* and *Guaranty Trust* it likely would be so characterized today").  If the cause of action did not come from state or federal equity law, then it came from the "general" law of equity, just as today we recognize that a cause of action for unseaworthiness arises under the "general maritime law."  *See The Dutra Grp. v. Batterton*, 139 S. Ct. 2275, 2278 (2019); *Luwisch v. Am. Marine Corp.*, 956 F.3d 320, 326 (5th Cir. 2020), *reh'g denied* (May 22, 2020).

[5] *See City of Beaumont v. Bouillion*, 896 S.W.2d 143, 149 (Tex. 1995*)* ("[S]uits for equitable remedies for violation of constitutional rights are not prohibited."); *Kaufman Cty. v. McGaughey*, 21 S.W. 261, 265 (Tex. App.--Austin 1893, writ ref'd) (holding that plaintiff stated an equitable cause of action to restrain Texas Commissioner of the General Land Office); *see generally* 44 Tex. Jur. 3d Injunctions § 692 (2020) ("Equitable relief by injunction is available to prevent executive officers of government from causing injury by administrative actions taken by them in excess of their authority.").

[6] *Franchise Tax Bd. v. Constr. Laborers Vacation Tr. for S. Cal.*, 463 U.S. 1, 13 (1983) (explaining that a state cause of action case can raise a federal question for the purposes of subject-matter jurisdiction "if a well-pleaded complaint establishe[s] that its right to relief under state law requires resolution of a substantial question of federal law in dispute between the parties"); *see also Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 643, 645 (2002) (holding that federal question jurisdiction existed over claim "that state officials be restrained from enforcing an order in contravention of controlling federal law" because the plaintiff's "claim turns on whether the [Telecommunications Act of 1996], or an FCC ruling issued thereunder, precludes the [state] Commission from ordering payment"); *cf. Cohens v. Virginia*, 19 U.S. (6 Wheat.) 264, 379 (1821) (interpreting "arising under . . . the Laws of the United States" language of Article III to explain that a case in equity "may truly be said to arise under the constitution or a law of the United States, whenever its correct decision depends on the construction of either").

No. 18-51092

Andrew S. Oldham, *Circuit Judge*, concurring:

I join the court's thoughtful opinion to correct our circuit precedent. I write separately about Green Valley's cause of action. The court says that "Green Valley has a cause of action against [state officials] *at equity*." *Ante*, at 19 (citing *Ex parte Young*, 209 U.S. 123, 149 (1908)). That's a jarring sentence. After all, it's Congress—not a court—that creates a cause of action. And no party in this case ever asked us to find a cause of action under *Ex parte Young*. I nonetheless conclude that the court faithfully applies Supreme Court precedent, even if it raises other questions about the limits of Article III.

## I.

## A.

Courts are not legislatures with a free-ranging ability to correct mistakes—even our own. *Broadrick v. Oklahoma*, 413 U.S. 601, 610–11 (1973) ("[U]nder our constitutional system courts are not roving commissions assigned to pass judgment on the validity of the Nation's laws."). That's why we start every case, as the court faithfully does here, by assuring ourselves of our own jurisdiction. Our constitutional jurisdiction requires that the parties present a "Case" or "Controversy" within the meaning of Article III. And we also must ensure that Congress gave us statutory jurisdiction, for instance under 28 U.S.C. § 1331, to hear that "Case" or "Controversy." *Gunn v. Minton*, 568 U.S. 251, 256–57 (2013). No matter how wrong a precedent might be, unless we have jurisdiction, we cannot fix it. *See McGirt v. Oklahoma*, 140 S. Ct. 2452, 2020 WL 3848063, at *40 (July 9, 2020) (Thomas, J., dissenting) ("[O]ur desire to decisively 'settle [important disputes] for the sake of convenience and efficiency' must yield to the 'overriding and time-honored concern about keeping the Judiciary's power

No. 18-51092

within its proper constitutional sphere.'" (quoting *Hollingsworth v. Perry*, 570 U.S. 693, 704–05 (2013)) (alterations in original)).

While having jurisdiction is necessary, it's generally not sufficient to render judgment in any specific case. That's because Congress must also empower the specific *parties* to invoke our jurisdiction and to seek their specified remedy. In other words, plaintiffs must also show they have a "cause of action." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 89 (1998) (holding a cause of action is a non-jurisdictional requirement).

## B.

In this case, the court says *Ex parte Young* provides Green Valley's cause of action.[1] So let's talk about *Ex parte Young*.

It was an original habeas action in the Supreme Court. It arose out of nine derivative suits brought by railroad shareholders against their own

---

[1] As *Steel Co.* makes clear, *jurisdiction* and a *cause of action* are two independent requirements to invoke the judicial power: "It is firmly established in our cases that the absence of a valid (as opposed to arguable) cause of action does not implicate subject-matter jurisdiction, *i.e.*, the courts' statutory or constitutional power to adjudicate the case." 523 U.S. at 89. Even so, when a plaintiff lacks a cause of action—and a defendant timely points that out to the court—it's still fatal to the claim. *See Bell v. Hood*, 327 U.S. 678, 682 (1946) ("[I]t is well settled that the failure to state a proper cause of action calls for a judgment on the merits and not for a dismissal for want of jurisdiction."). So, it's surprising that Judge Elrod argues that "Green Valley need not rely on an 'implied' cause of action." *Ante*, at 1 (Elrod, J., joined by Higginson & Costa, JJ., concurring). If Green Valley did not need a cause of action, then why did the court determine Green Valley had one before resolving the interpretation of § 1926(b) in this case? *Ante*, at 19. The answer is obvious: Without that cause of action, Green Valley's claim would have failed at the outset. *Compare Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 127, 140 (2014) (holding the plaintiff "[was] entitled to a chance to prove its case" only after the Court determined "a legislatively conferred cause of action encompasse[d] [its] claim"), *with Sosa v. Alvarez-Machain*, 542 U.S. 692, 697, 713 (2004) (holding that no "private cause of action" had been Congressionally authorized, and thus, plaintiff was "not entitled to a remedy"); *see also Shrimpers & Fishermen of RGV v. Tex. Comm'n on Envt'l Quality*, ___ F.3d ___, 2020 WL 4376883, at *7 (5th Cir. July 31, 2020) (Oldham, J., concurring).

railroads and the Attorney General of Minnesota, Edward T. Young. *See Young*, 209 U.S. at 129. The shareholders were mad about railroad regulation. During the twilight of the gilded age and as the twentieth century dawned, a series of political movements—the Grangers, the Populists, the Progressives—used state law to regulate how much railroads could charge. *See* Barry Friedman, *The Story of* Ex Parte Young, *in* FEDERAL COURT STORIES 251–52 (Vicki C. Jackson & Judith Resnik eds., 2010). These laws made "those who were to use the railroads"—farmers and everyday passengers—"the final arbiters as to what . . . was reasonable" to "pay for such use." Charles Francis Adams, Jr., *The Granger Movement*, 120 N. AM. REV. 394, 395 (1875). In 1907, Minnesota passed a series of such laws, preventing the railroads from charging more than two cents per passenger per mile. *Perkins v. N. Pac. Ry. Co.*, 155 F. 445, 456 (C.C.D. Minn. 1907). And Young convinced the legislature to impose stiff penalties for any violation of this state-imposed rate. Friedman, *supra*, at 260–61.

The shareholders sued their own railroad corporations to forbid them from following Minnesota's rate laws because the laws were allegedly unconstitutional under, *inter alia*, the Fourteenth Amendment. *Young*, 209 U.S. at 129–30. As part of that intra-corporate dispute, the shareholders also sued Young to stop him from enforcing those state laws. After a hearing, the district court found the rates indeed violated the Fourteenth Amendment and issued a preliminary injunction against Young from enforcing the rates. *Id.* at 132. Young disobeyed that injunction by filing suit against the railroads anyway. The court held Young in contempt, which of course is what he wanted. *Id.* at 133–34; Friedman, *supra*, at 264. Young then sought a writ of habeas corpus from the Supreme Court, arguing that the injunction he violated was invalid. *Young*, 209 U.S. at 126–27. Why? Young said he could not be haled into court because the suit against him was effectively a suit

No. 18-51092

against the State of Minnesota, prohibited by "the Eleventh Amendment."[2] *Id.* at 132.

The Supreme Court disagreed. The Supreme Court's opinion reached two conclusions relevant here. First, Young could be sued, notwithstanding the State's sovereign immunity. *Id.* at 159–60; *see also Va. Off. for Prot. & Advoc. v. Stewart*, 563 U.S. 247, 255 (2011) ("[W]hen a federal court commands a state official to do nothing more than refrain from violating federal law, he is not the State for sovereign-immunity purposes."). Second, an equitable cause of action would open the federal courts to suits like the one against Young. *Young*, 209 U.S. at 165–166. The Court explained that "[t]he question of sufficiency of rates is important and controlling; and, being of a judicial nature, it ought to be settled at the earliest moment by *some* court." *Id.* at 166 (emphasis added). And "when a Federal court first obtains

---

[2] The Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State." U.S. Const. amend. XI. By its terms, the Amendment does not apply to the situation in today's appeal—or in *Young* itself—where a citizen sues his *own* State (or a public official of that State). *See Young*, 209 U.S. at 123 (noting that the suit that led to the contempt order against Young was brought against him by a Minnesota citizen). Still, the Supreme Court has often used "Eleventh Amendment immunity" as a synonym for the States' broader constitutional sovereign immunity. *See, e.g.*, *Seminole Tribe of Fla. v. Florida*, 517 U.S. 44 (1996) (using "state sovereign immunity" and "Eleventh Amendment immunity" interchangeably); *cf. id.* at 54 (explaining that the Court understood the Eleventh Amendment to "confirm[]" "the presupposition" that "each State is a sovereign entity in our federal system" (quotation omitted)); *Franchise Tax Bd. of Cal. v. Hyatt*, 139 S. Ct. 1485, 1496 (2019) ("Although the terms of [the Eleventh] Amendment address only . . . specific provisions . . . [,] the natural inference from its speedy adoption is that the Constitution was understood . . . to preserve the States' traditional immunity from private suits." (quotation omitted)). I use the term "Eleventh Amendment immunity" to refer to the immunity recognized in the text of that amendment and the term "state sovereign immunity" to refer to the States' broader constitutional immunity that predated the ratification of the Eleventh Amendment.

No. 18-51092

jurisdiction it ought, on general principles of jurisprudence, to be permitted to finish the inquiry and make a conclusive judgment, to the exclusion of all other courts." *Ibid.* In other words, a federal cause of action was available to seek equitable relief against state officers.[3]

## II.

The second of *Ex parte Young*'s holdings—the implied cause of action sounding in equity—is interesting.[4] In the years since 1908, the Supreme Court has told us that this equitable cause of action is "beyond dispute" and "federal courts have jurisdiction over suits to enjoin state officials from interfering with federal rights." *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 96 n.14 (1983) (citing *Young*, 209 U.S. at 160–62). And in more recent years, the Court has reaffirmed this cause of action as accepted fact. *See Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326 (2015) ("[A]s we have long recognized, if an individual claims federal law immunizes him from state regulation, the court may issue an injunction upon finding the state regulatory actions preempted."); *Free Enter. Fund v. Pub. Co. Acct. Oversight*

---

[3] It's unclear how the *Young* Court reached the conclusion that a freestanding federal equity cause of action existed. Many of the Court's statements lack citations. And, in many of the cases the Court cites, state law supplied the cause of action. *See, e.g.*, *Chi., Milwaukee & St. Paul Ry. Co. v. Minnesota ex rel. R.R. & Warehouse Comm'n*, 134 U.S. 418, 418, 435 (1890) (appeal from Minnesota Supreme Court's award of a writ of mandamus provided for by state statute); *Reagan v. Farmers' Loan & Tr. Co.*, 154 U.S. 362, 391–92 (1894) ("[I]n the act before us, express authority is given for a suit against the commission to accomplish that which was the specific object of the present suit."); *Covington & Lexington Tpk. Rd. Co. v. Sandford*, 164 U.S. 578, 580 (1896) (appeal from decision of Kentucky chancery court).

[4] As noted above, *Ex parte Young* itself was a habeas proceeding in the Supreme Court. But the underlying railroad litigation arrived in the lower federal court as a "bill in equity." *Young*, 209 U.S. at 166. It is this bill in equity that, according to the court, supplies Green Valley's cause of action.  And that bill is what I have in mind when I refer to the "*Ex parte Young* cause of action."

*Bd.*, 561 U.S. 477, 491 n.2 (2010); *Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 642 (2002).

But the Court hasn't told us where this cause of action comes from. Nor is it clear how we should understand this cause of action alongside other federal-courts doctrines.

## A.

The source of law for a cause of action generally differs in diversity and federal question cases. For diversity cases, state law provides it. *See* 28 U.S.C. § 1652; *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938). For federal question cases, we generally look to federal *statutes*. *See Gunn*, 568 U.S. at 257–58. After all, federal causes of action are Congress's to authorize. *Alexander v. Sandoval*, 532 U.S. 275, 286 (2001) ("Like substantive federal law itself, private rights of action to enforce federal law must be created by Congress.").

We must look at statutes for federal causes of action because "there is 'no federal general common law.'" *Rodriguez v. Fed. Deposit Ins. Corp.,* 140 S. Ct. 713, 717 (2020) (quoting *Erie*, 304 U.S. at 78). Instead, the "Constitution . . . vests the federal government's 'legislative Powers' in Congress and reserves most other regulatory authority to the States." *Ibid.* As a consequence, federal courts cannot "formulate federal common law" causes of action merely because Congress "vested jurisdiction in the[m]." *Tex. Indus., Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630, 640–42 (1981); *cf. Hernandez v. Mesa*, 140 S. Ct. 735, 742 (2020) ("With the demise of federal general common law, a federal court's authority to recognize a damages remedy must rest at bottom on a statute enacted by Congress.").

So, when a plaintiff brings a federal-question claim into court, we must "determine . . . whether a legislatively conferred cause of action encompasses [that] particular plaintiff's claim." *Lexmark Int'l, Inc. v. Static Control*

*Components, Inc.*, 572 U.S. 118, 127 (2014). In other words, "we ask[]
whether this particular class of persons ha[s] a right to sue under this
substantive [federal] statute." *Ibid.* (quotation omitted) (emphasis added).
This inquiry helps courts stay in their lane: relying on Congressionally-
enacted statutes forbids a court from "apply[ing] its independent policy
judgment to recognize a cause of action that Congress has denied" or
"limit[ing] a cause of action that Congress has created." *Id.* at 128; *cf. Sprint
Commc'ns, Inc. v. Jacobs*, 571 U.S. 69, 77 (2013) ("Federal courts, it was early
and famously said, have 'no more right to decline the exercise of jurisdiction
which is given, than to usurp that which is not given.'" (quoting *Cohens v.
Virginia*, 19 U.S. (6 Wheat.) 264, 404 (1821)).

It's usually a pretty straightforward inquiry to determine if a federal
statute authorizes a cause of action. Simply put, we look at the text. For
instance, the text of the cause of action provided by the Administrative
Procedure Act is not hard to find: "A person suffering legal wrong because
of agency action, or adversely affected or aggrieved by agency action within
the meaning of a relevant statute, is entitled to judicial review thereof."
5 U.S.C. § 702. And the text of the Clean Water Act provides, among other
things, a capacious cause of action for "any citizen" "against any person . . .
who is alleged to be in violation" of "an effluent standard or limitation" or
"an order issued" about such "standard or limitation." 33 U.S.C. § 1365. In
the main, "using traditional tools of statutory interpretation," the statutes
tell the courts who can sue, who can be sued, and the remedies available.
*Lexmark*, 572 U.S. at 127.

Sometimes the inquiry is less straightforward because the Supreme
Court has inferred a cause of action from a statute that is silent on the issue.
*See, e.g.*, *Cannon v. Univ. of Chicago*, 441 U.S. 677, 709 (1979). Nevertheless,
in these implied-cause-of-action cases, the text of the statute remains
paramount. *Alexander*, 532 U.S. at 286. After all, "a plaintiff suing under an

implied right of action still must show that the statute manifests an intent 'to create not just a private *right* but also a private *remedy*.'" *Gonzaga Univ. v. Doe*, 536 U.S. 273, 284 (2002) (quoting *Alexander*, 532 U.S. at 286). But "where the text and structure of a statute provide no indication that Congress intends to create new individual rights, there is no basis for a private suit." *Id.* at 286.

No matter how the cause-of-action inquiry proceeds—explicitly or implicitly—the Congressionally-enacted text remains the lodestar. At times, the text has provided the slenderest of reeds. For instance, in interpreting the Alien Tort Statute, the Supreme Court held that this plainly "jurisdictional" statute was phrased in such a way as to show "the common law would provide a cause of action for [a] modest number of international law violations." *Sosa v. Alvarez-Machain*, 542 U.S. 692, 724 (2004); *see* 28 U.S.C. § 1350 ("The district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States."). But still the Court relied on some text, somewhere.

### B.

The *Ex parte Young* cause of action stands out because it does not rest on statutory text. Nor does it find its home in the text of the Constitution. For example, the Supreme Court has reaffirmed that causes of action do not come from the Supremacy Clause: "the Supremacy Clause is not the 'source of any federal rights,' and *certainly* does not create a cause of action." *Armstrong*, 575 U.S. 320, 324–25, (quoting *Golden State Transit Corp. v. Los Angeles*, 493 U.S. 103, 107 (1989)) (emphasis added). Instead, the Supremacy Clause is a rule of decision: "It instructs courts what to do when state and federal law clash, but is silent regarding who may enforce federal laws in court, and in what circumstances they may do so." *Id.* at 325.

If the *Ex parte Young* cause of action is not from a statute and not from the Constitution, perhaps it stems from a vestigial form of "judicially recognized common law." *See* R. FALLON, J. MANNING, D. MELTZER, & D. SHAPIRO, HART AND WECHSLER'S THE FEDERAL COURTS AND THE FEDERAL SYSTEM 745 (7th ed. 2015) ["HART & WECHSLER"]. That's not a particularly satisfying answer. Whatever the propriety of such federal common lawmaking in 1908 (when *Ex parte Young* was decided), the Supreme Court has since "correct[ed]" the "unconstitutional assumption of [lawmaking] powers by the Courts of the United States." *Erie*, 304 U.S. at 79 (quotation omitted); *see also Ruhlin v. N.Y. Life Ins. Co.*, 304 U.S. 202, 205 (1938) (explaining that the *Erie* doctrine "applies though the question of construction arises not in an action at law, but in a suit in equity."). Granted, the Court has admitted that "it is much too late to deny that there is a significant body of federal law that has been fashioned by the federal judiciary in the common-law tradition." *Nw. Airlines, Inc. v. Transp. Workers Union of Am., AFL-CIO*, 451 U.S. 77, 95 (1981). But the current approach is to accept this tradition in "only limited areas," such as "admiralty disputes and certain controversies between States" *Rodriguez*, 140 S. Ct. at 717. The *Ex parte Young* cause of action, of course, stems from neither and does not appear to be limited.

## C.

What's more, it's not obvious how we're supposed to square the implied equitable cause of action in *Ex parte Young* with federal statutes, other lines of Supreme Court precedent, and the limited role of federal courts in our constitutional system.

*First*, the cause of action seems at odds with 42 U.S.C. § 1983. As the complaint in this very case recognizes, § 1983—like an *Ex parte Young* action—is a vehicle for arguing that a federal statute preempts a state law or

regulation. *See Golden State Transit Corp.*, 493 U.S. at 107 n.4 ("[A] Supremacy Clause claim based on a statutory violation is enforceable under § 1983 only when the statute creates 'rights, privileges, or immunities' in the particular plaintiff."). If a preemption claim can be brought under § 1983, it's not obvious why we need a non-statutory cause of action that does the same thing. *Cf. Seminole Tribe of Fla. v. Florida*, 517 U.S. 44, 74 (1996) ("[W]here Congress has prescribed a detailed remedial scheme for the enforcement against a State of a statutorily created right, a court should hesitate before casting aside those limitations and permitting an action against a state officer based upon *Ex parte Young*.").

Of course, this circuit has previously held that political subdivisions or municipalities—like Green Valley—can't sue as plaintiffs under § 1983. *City of Safety Harbor v. Birchfield*, 529 F.2d 1251, 1255–56 (5th Cir. 1976). But it's not clear that makes any difference. If our precedent is wrong and this claim should go forward under § 1983, then Green Valley doesn't need *Ex parte Young. Cf. Golden State Transit Corp.*, 493 U.S. at 108 n.4. But if our precedent is right, it further undermines any reliance on *Ex parte Young*. When Congress has "express[ly] provi[ded] . . . one method of enforcing a substantive rule" it "suggests that Congress intended to preclude others" recognized by the courts. *Sandoval*, 532 U.S. at 290. To find such a cause of action "when there is no such right under the pertinent statute itself, would effect a complete end-run around th[e] [Supreme] Court's . . . 42 U.S.C. § 1983 jurisprudence." *Douglas v. Indep. Living Ctr. of S. Cal., Inc.*, 565 U.S. 606, 619 (2012) (Roberts, C.J., dissenting).

And that's exactly how we approach causes of action in other contexts. Take *Bivens v. Six Unknown Fed. Narcotics Agents*, 403 U.S. 388

(1971).[5] When a federal statute, a state statute, or an administrative proceeding would provide an alternative form of relief, the Court has generally declined to recognize a *Bivens* action. *See Ziglar v. Abbasi*, 137 S. Ct. 1843, 1858 (2017) ("[I]f Congress has created 'any alternative, existing process for protecting the [injured party's] interest' that itself may 'amoun[t] to a convincing reason for the Judicial Branch to refrain from providing a new and freestanding remedy in damages.'" (quoting *Wilkie v. Robbins*, 551 U.S. 537, 550 (2007)). So, for example, there's no *Bivens* action against the United States for employment disputes because there are already "comprehensive procedural and substantive provisions giving meaningful remedies." *Bush v. Lucas*, 462 U.S. 367, 368 (1983). Same for social security disputes, *see Schweiker v. Chilicky*, 487 U.S. 412, 426–27 (1988), and those against private prisons, *see Corr. Servs. Corp. v. Malesko*, 534 U.S. 61, 72–74 (2001). The analysis doesn't change because the other avenues of relief don't provide the same remedies as *Bivens* would—still no *Bivens*. *See Minneci v. Pollard*, 565 U.S. 118, 129 (2011) ("State-law remedies and a potential *Bivens* remedy need not be perfectly congruent."). And it still doesn't change when those avenues of relief can only be pursued in state, not federal, court. *Id.* at 129, 131.

It's therefore unclear why the *Ex parte Young* cause of action would not be interpreted similarly—especially when § 1983 exists and the state courts provide alternative avenues for relief.[6]

---

[5] In *Bivens,* "the [Supreme] Court broke new ground by holding that a person claiming to be the victim of an unlawful arrest and search could bring a Fourth Amendment claim for damages against the responsible agents even though no federal statute authorized such a claim." *Hernandez*, 140 S. Ct. at 741. The Court inferred this cause of action from the Constitution itself. *Ibid*. The Supreme Court has declined to expand *Bivens* in every case it has considered over the last four decades. *Id*. at 743.

[6] Judge Elrod argues that the "state equity doctrine" provides the solution to the

No. 18-51092

*Second*, it's not clear how to reconcile the *Ex parte Young* cause of action with the Supreme Court's precedents under the Declaratory Judgment Act. Obviously, that Act does not create a standalone cause of action. Rather, "the operation of the Declaratory Judgment Act is procedural only." *Aetna Life Ins. Co. of Hartford, Conn. v. Haworth*, 300 U.S. 227, 240 (1937). It allows parties who would otherwise be defendants to seek relief as plaintiffs. *See, e.g., Medtronic, Inc. v. Mirowski Fam. Ventures, LLC*, 571 U.S. 191, 197 (2014); HART & WECHSLER, *supra*, at 842–43. The base requirement is that the plaintiff must face a "threatened" action from the defendant, which "would necessarily present a federal question." *Ibid*.

The Supreme Court has expressed a wariness, however, about allowing declaratory judgment actions that raise only preemption questions. For example, the Court has denied jurisdiction over a case where a state regulatory authority sought a declaration that its own regulations were not preempted by federal law. *See Franchise Tax Bd. of Cal. v. Constr. Laborers Vacation Tr. for S. Cal.*, 463 U.S. 1, 19 (1983). This hesitancy reflects a centuries-old duty to avoid issuing advisory opinions about the validity of certain laws. *Flast v. Cohen*, 392 U.S. 83, 96 n.14 (1968); Letter from Chief Justice John Jay and the Associate Justices to President George Washington (Aug. 8, 1793), *in* 3 CORRESPONDENCE & PUBLIC PAPERS OF JOHN

---

"*Ex parte Young* riddle." *Ante*, at 2 & n.5 (Elrod, J., joined by Higginson & Costa, JJ., concurring). But if state equity provides the cause of action, then that would make the implication of a federal cause of action even more unnecessary. At least that's what the Supreme Court has told us in other contexts, like *Bivens*. *See, e.g.*, *Minneci*, 565 U.S. at 129–31. It's also unclear how Judge Elrod's state-equity theory can be squared with cases where *Ex parte Young* supplies the cause of action against *federal* officials. *See, e.g.*, *Free Enter. Fund*, 561 U.S. at 491 n.2 (relying on *Young* to permit a freestanding cause of action against a federal agency and its officials). After all, state law generally cannot direct "the exercise of the powers of the [federal] government"—a federal official's "conduct can only be controlled by the power that created him." *McClung v. Silliman*, 19 U.S. (6 Wheat.) 598, 605 (1821); *cf. Tarble's Case*, 80 U.S. 397, 410–12 (1870).

Jay 488–89 (Johnston ed. 1891). And as Justice Jackson once explained, federal courts cannot be used to "establish" legal defenses—such as preemption—"to hold in readiness for [future] use." *Pub. Serv. Comm'n of Utah v. Wycoff Co.*, 344 U.S. 237, 245 (1952). Instead, the federal courts can exercise their limited duty to say what the law is when a party is actually at "risk of suffering penalty, liability, or prosecution" by a state. *Ibid.*

Moreover, even threatened injury by a State may not be sufficient for the federal courts to weigh in under the Declaratory Judgment Act. That's because federal courts should "not seize litigations from state courts merely because one, normally a defendant, goes to federal court to begin his federal-law defense before the state court begins the case under state law." *Id.* at 249. As the Supreme Court later explained, "it is generally to be assumed that state courts and prosecutors will observe constitutional limitations as expounded by this Court, and that the mere possibility of erroneous initial application of constitutional standards will usually not amount to the irreparable injury necessary to justify [federal equitable proceedings]." *Dombrowski v. Pfister*, 380 U.S. 479, 484–85 (1965). In other words, the federal courts will steer clear of using declaratory judgments to interfere in state-law disputes—even if there are questions of federal law buried in the litigation. *Cf. Louisville & Nashville R.R. Co. v. Mottley*, 211 U.S. 149, 154 (1908) (denying federal jurisdiction where the "Federal question" was merely what "the defense of defendants would be").

Given this hesitancy to intervene in state-law disputes in declaratory judgment proceedings—where Congress textually authorized relief—one might reasonably wonder too about the judicially-created *Ex parte Young* cause of action in cases involving state-law disputes and same-State parties. *Cf. Wycoff*, 344 U.S. at 247 ("Declaratory proceedings in the federal courts against state officials must be decided with regard for the implications of our federal system."). The Supreme Court has articulated that the power to craft

federal common law is at its apogee "in interstitial areas of particular federal interest." *Sosa*, 542 U.S. at 726. With this understanding, it might make some sense for the federal courts to hear a federal case about federal actors using a federal equitable cause of action. *See, e.g.*, *Free Enter. Fund*, 561 U.S. at 491 n.2. It's quite another thing to say that "federal interest" persists in a case exclusively involving state actors.

*Third*, a judicially created cause of action over the States creates some tension with our modern solicitude for state courts and state law in the post-*Erie* era. After all, "[i]t is the state courts which have the first and the last word as to the meaning of state statutes." *Wycoff*, 344 U.S. at 247. And the Supreme Court has told us that state courts are equally competent to render constitutional decisions. *See Haywood v. Drown*, 556 U.S. 729, 735 (2009) ("[S]tate courts as well as federal courts are entrusted with providing a forum for the vindication of federal rights violated by state or local officials acting under color of state law."). So it's no surprise that state courts often hear run-of-the-mill disputes about whether federal or state law controls an issue. And no one questions the state courts' competence to do so. *See, e.g.*, *Levine v. Wyeth*, 944 A.2d 179, 183–94 (Vt. 2006), *aff'd sub nom. Wyeth v. Levine*, 555 U.S. 555, 563–64 (2008) (affirming Vermont Supreme Court on a preemption question).

In the end, there are plenty of reasons to worry about inferring "a cause of action against [state officials] *at equity*." *Ante*, at 19 (citing *Young*, 209 U.S. at 149). During the debates on the ratification of the Constitution, the Anti-Federalists expressed deep fears that the federal courts would run roughshod over the States. For example, Brutus worried that federal "judges will be interested to extend the power of the courts, and to construe the constitution as much as possible, in such a way as to favour it." Brutus XI, ¶ 2.9.140, *in* 2 The Complete Anti-Federalist 420 (Herbert Storing ed., 1981). This inevitable growth of federal judicial power, he

No. 18-51092

warned, would lead to "an entire subversion of the legislative, executive and judicial powers of the individual states." *Id.* at ¶ 2.9.139; *see also Observations on the New Constitution, And on the Federal and State Conventions. By a Columbian Patriot*, *in* 4 The Complete Anti-Federalist 270, 276. Query what they'd think about an implied cause of action to challenge state law as preempted.

\*      \*      \*

Does Green Valley have a cause of action? Our circuit's interpretation of the text enacted by Congress in 42 U.S.C. § 1983 says no, but a long line of cases dating back to *Ex parte Young* says yes. As between them, we're obviously bound to follow the latter.[7] Therefore, I concur.

---

[7] Judge Elrod critiques even asking these questions because our court did not have "the benefit of adversarial briefing from the parties." *Ante*, at 1 (Elrod, J., joined by Higginson & Costa, JJ., concurring). The reason we don't have that briefing is because it was *our court* that—without invitation or argument from the parties—invoked *Ex parte Young* to supply Green Valley's cause of action. In both the district court and our court, Green Valley argued *only* that § 1983 supplied its cause of action; it said nothing about "state equity law," *id.* at 2, "state equity doctrine," *ibid.*, "federal equity law," *id.* at 2 n.4, "the 'general' law of equity," *ibid.*, "the body of common law," *id.* at 1 n.2, "the body of equitable doctrine," *ibid.*, *Ex parte Young*, or any other thing that conceivably provides a court-created cause of action. So our court's *sua sponte* invocation of *Ex parte Young* gave me pause. Having studied the issue, I am now satisfied that we're faithfully applying Supreme Court precedent. You might reasonably have thought that federal judges could, would, and should perform such inquiries. As then-Professor Scalia once put it, it is "inherited wisdom" that "responsible professional comment and criticism are the principal restraints upon judicial arbitrariness at the highest level." Antonin Scalia, *Sovereign Immunity and Nonstatutory Review of Federal Administrative Action: Some Conclusions from the Public-Lands Cases*, 68 Mich. L. Rev. 867, 867 (1970).